**SCOTT TIMBER COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Nos. 94–784C, 96–204C.**

United States Court of Federal Claims.

March 12, 1998.

Alan I. Saltman, Saltman and Stevens, P.C., with whom were Ruth G. Tiger, Kevin W. McArdle, and Richard W. Goeken, Washington, DC, for plaintiff.

John S. Groat, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, with whom were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and Richard E. Rice, Assistant Director, for defendant. Leslie Lagomarcino and Laurie Ristino, Office of General Counsel, United States Department of Agriculture, of counsel.

## OPINION

MARGOLIS, Judge.

This contract case is currently before the Court on plaintiff's motion for partial summary judgment on the issue of liability, and defendant's cross-motion for summary judgment. Plaintiff argues that the government lacked contractual authority to suspend plaintiff's timber harvesting operations under the contracts at issue in this case, and therefore the government is liable to plaintiff for breach of contract. Defendant argues that it did not breach the contracts at issue because, under the express terms of those contracts, the government reserved the right to unilaterally suspend plaintiff's operations. Alternatively, defendant argues that the government is shielded from liability for any alleged breach of the contracts under the sovereign acts doctrine.

After considering the arguments presented by both parties in their briefs and at oral argument, the Court finds that the Forest Service did possess contractual authority to suspend plaintiffs performance under each of the contracts at issue. Therefore, plaintiff's motion for summary judgment on the issue of liability must be denied. However, there is a genuine issue of material fact as to whether the Forest Service acted reasonably in exercising its authority to suspend the contracts. Therefore, defendant's motion for summary judgment must also be denied.

## BACKGROUND

These consolidated cases concern 11 separate contracts that were made between plaintiff, Scott Timber Company ("Scott"), and defendant, the United States, acting through the United States Department of Agriculture, United States Forest Service ("Forest Service"), for the sale and harvest of timber in the Siskiyou and Siuslaw National Forests in Oregon. The sales at issue in this case were specifically authorized by Section 318 of the Department of the Interior Appropriations Act of 1990, Pub.L. No. 101–121, 103 Stat. 741 (1989), and are therefore commonly referred to as "Section 318 sales." By enacting Section 318—a law that was known as the "Northwest Timber Compromise"—Congress mandated that "[t]he Forest Service shall offer ... an aggregate timber sale level of seven billion seven hundred million board feet of net merchantable timber from the national forests of Oregon and Washington for fiscal years 1989 and 1990." Pub.L. No. 101–121, 103 Stat. 701, 745–50.

After conducting environmental analyses of the Section 318 sales at issue in this case, the Forest Service issued "Findings of No Significant Impact" ("FONSIs") for each of the sale areas. Subsequently, the Forest Service solicited competitive bids for the sales between February 21, 1990, and September 10, 1990. Scott Timber was the high

bidder on 11 sales, and as a result was awarded the following contracts:

| Timber Sale Area | Contract No. | Estimated Volume [1] | Date of Award |
|---|---|---|---|
| Toastberry | 073842 | 3,820 MBF | 7/3/90 |
| Father Oak | 073784 | 5,060 MBF | 4/9/90 |
| Beamer 712 | 085001 | 8,900 MBF | 7/2/90 |
| Formader 717 | 083410 | 2,400 MBF | 7/20/90 |
| Indian Hook | 085126 | 15,200 MBF | 9/17/90 |
| Cat Track | 074188 | 9,430 MBF | 9/26/90 |
| Maria Skyline | 085209 | 12,700 MBF | 9/25/90 |
| Formader 103 | 085068 | 8,300 MBF | 8/20/90 |
| Skywalker | 085118 | 7,700 MBF | 9/10/90 |
| Wapiti 305 | 083428 | 2,300 MBF | 10/16/90 |
| Raspberry | 074121 | 12,900 MBF | 9/26/90 |

For each contract that was awarded, Scott submitted, and the Forest Service approved, a "General Plan of Operation" that outlined Scott's schedule of operations in each of the timber sale areas.

Despite the Forest Service's award of the contracts and approval of Scott Timber's operating plans, the Forest Service suspended Scott's performance under all of the contracts on or about September 17, 1992, before Scott could begin harvesting timber in earnest. The decision to suspend Scott's operations was prompted by concerns over the protection of a small, robin-like bird known as the "marbled murrelet" (*Brachyramphus marmoratus*). More specifically, the Forest Service's decision was prompted by a Temporary Restraining Order ("TRO"), issued by Judge Barbara Rothstein of the United States District Court for the Western District of Washington, that prohibited the logging of any marbled murrelet habitat on the Siskiyou and Siuslaw National Forests. *See Marbled Murrelet v. Lujan*, No. C91–522R (W.D.Wash. September 16, 1992).

Concerns about the protection of the marbled murrelet and its habitat had apparently been raised several years prior to the district court's issuance of the TRO and the Forest Service's resulting decision to suspend plaintiff's contracts. On January 12, 1988, the National Audubon Society and 32 of its chapters in Washington, Oregon, and California filed a petition with the United States Fish and Wildlife Service ("FWS"), requesting that FWS list the murrelet as a "threatened

species." On October 17, 1988, FWS accepted the Audubon Society's petition, and stated that "the petition presented substantial information indicating that [listing the murrelet as a threatened species] may be warranted." 53 Fed.Reg. 40,479 (Oct. 17, 1988). FWS invited public comments on the possible listing of the murrelet until December 1, 1988.

On January 6, 1989, FWS issued a revised notice identifying the marbled murrelet as a Category 2 taxa, that is, a taxa for which information then in the possession of FWS indicated that "proposing to list as endangered or threatened is possibly appropriate." 54 Fed.Reg. 554 (Jan. 6, 1989). The January 6 notice also "encourage[d] Federal agencies and other appropriate parties to take these taxa into account in environmental planning." *Id.* By March 1989, the Forest Service had identified the marbled murrelet as a "sensitive species" in Region 6, an area that includes the states of Oregon and Washington. Other federal and state agencies, including the United States Bureau of Land Management, the Washington Department of Wildlife, and the Oregon Department of Fish and Wildlife, had also listed the murrelet as a sensitive species. In addition, the California Department of Fish and Game had listed the murrelet as a "species of special concern."

Despite these actions, by April 1991 FWS had still not acted upon the Audubon Society's January 12, 1988 petition to list the marbled murrelet as a threatened species. Therefore, on April 17, 1991, several chapters of the Audubon Society filed suit against

1. Timber volume is shown in "MBF," which represents one thousand board feet.

FWS in the United States District Court for the Western District of Washington, seeking to compel FWS to make a final decision whether or not to list the murrelet. *See Marbled Murrelet v. Lujan*, No. C91–522 (W.D. Wash. filed April 17, 1991) ("murrelet listing suit"). Following the institution of the murrelet listing suit, FWS published a notice in the *Federal Register* proposing to list the marbled murrelet as a threatened species. *See* 56 Fed.Reg. 28,362 (June 20, 1991). On July 29, 1992, FWS issued another notice in the *Federal Register* extending the deadline for making a final determination on the proposal to add the murrelet to the list of threatened species until December 20, 1992. *See* 57 Fed.Reg. 33,478 (July 29, 1992).

By order dated September 15, 1992, Judge Rothstein of the Western District of Washington directed FWS to make a final determination concerning the marbled murrelet by September 18, 1992. *See Marbled Murrelet v. Lujan*, No. C91–522 (W.D.Wash. Sept. 15, 1992). On September 16, 1992, the plaintiffs in the murrelet listing suit filed an amended complaint adding the Forest Service as a defendant. In their amended complaint, the Audubon Society, plaintiffs in the listing suit, sought to "enforce defendant U.S. Forest Service's duty to maintain a viable population of marbled murrelets on the national forests, as required by the National Forest Management Act, 16 U.S.C. § 1600 *et seq.*" The listing suit plaintiffs also sought and were granted a TRO on September 16, 1992. *See Marbled Murrelet v. Lujan*, No. C91–522 (W.D.Wash. Sept. 16, 1992). Because this TRO prohibited "the logging of any marbled murrelet habitat" on a number of National Forests, including the Siskiyou and Siuslaw, *see id.*, the Forest Service orally informed Scott Timber on September 17, 1992, that it was suspending operations under the contracts at issue in this case.

Although the September 16 TRO expired by its own terms on September 26, 1992, the Forest Service informed the district court that it would continue to suspend logging operations in the Siskiyou and Siuslaw until FWS had made a determination whether or not to list the marbled murrelet as a threatened species. Specifically, counsel for the Forest Service informed Judge Rothstein that an agreement had been reached between the Forest Service and the plaintiffs in the listing suit, whereby the Forest Service would not permit the felling of any trees in marbled murrelet habitat until close of business September 29, 1992, i.e., the date by which FWS was required to make a final listing decision. In addition, the Forest Service informed Judge Rothstein that, in the event that FWS decided to list the murrelet as a threatened species, the Forest Service agreed not to fell any trees until the Forest Service had made a determination as to whether or not the felling of trees would affect the marbled murrelet.

Acting pursuant to the district court's September 15, 1992 order, FWS published a notice in the *Federal Register*, effective September 28, 1992, listing the marbled murrelet as a threatened species. *See* 57 Fed.Reg. 45,328 (Oct. 1, 1992). Consistent with its representations to the court that it would not fell any trees until a determination as to whether the felling of trees would affect the murrelet, the Forest Service informed Scott Timber that the Forest Service's September 17, 1992 decision to unilaterally suspend operations on the Siskiyou and Siuslaw would remain in effect indefinitely. Specifically, the Forest Service informed Scott, by letter, that the September 17 suspension would remain in effect until FWS issued a final biological determination concerning the marbled murrelet.

On October 1, 1992, the Forest Service initiated formal consultation with FWS, pursuant to section 7 of the Endangered Species Act, to determine what impact, if any, the proposed timber sales from the Siskiyou and Siuslaw National Forests would have on marbled murrelet habitat.[2] However, FWS did

---

**2.** Section 7 of the Endangered Species Act requires that every federal agency shall, "in consultation with and with the assistance of the Secretary [of Interior], ensure that any action authorized, funded, or carried out by such agen-

cy ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species...." 16 U.S.C. § 1536(a)(2). To

not accept the Forest Service's October 1 submission because it did not contain all of the required information under section 7. The Forest Service forwarded additional information to FWS on December 3, 1992, and FWS accepted the Forest Service's submission on December 8, 1992.

On July 20, 1993, the Fish and Wildlife Service issued a draft biological opinion detailing the impact of the proposed sales from the Siskiyou and Siuslaw National Forests on murrelet habitat. The Forest Service provided its own comments to the draft opinion, which it forwarded to FWS on August 20, 1993. After considering these comments, FWS issued a second draft biological opinion, which it forwarded to the Forest Service on September 2, 1993.

By letter to the Forest Service dated October 19, 1992, plaintiff Scott Timber indicated its belief that Scott was an "applicant" as defined in the Endangered Species Act, 16 U.S.C. § 1536(a)(3), (g), and FWS consultation regulations, 50 C.F.R. pt. 402. Scott therefore requested that the Forest Service allow Scott to participate in the consultation process. On November 13, 1992, the Forest Service notified Scott that Scott was indeed an applicant, and that Scott would be permitted to submit information and participate in any discussions that occurred during the consultation process. The Forest Service also informed Scott that, as an applicant, Scott's approval was required in order to extend the consultation process beyond 60 days.

Following the Forest Service's determination that Scott Timber was, indeed, an applicant, Scott Timber actively participated in the consultations between Forest Service and the Fish and Wildlife Service concerning the marbled murrelet. For example, representatives from Scott Timber participated in two "applicant meetings"—meetings designed, in part, to allow applicants to comment on the consultation process—on September 22 and October 7, 1993. In addition, Scott Timber submitted written materials to the Forest Service on November 12, 1993, wherein Scott commented upon FWS's draft biological opinion, and proposed "reasonable and prudent measures/alternatives" that purportedly would have allowed Scott to harvest timber on the proposed sale areas without disturbing murrelet habitat. Scott's November 1993 submission to the Forest Service also incorporated by reference several written submissions that had previously been forwarded to the Forest Service and FWS by an entity known as the Siuslaw Timber Operators Association.

Throughout the Forest Service's consultation with FWS, the 11 timber sale contracts at issue in this case remained suspended.[3] During this suspension period, however, the parties negotiated and executed a number of contract modifications addressing two areas of concern: first, the extension of the contract termination dates through Contract Term Adjustments ("CTAs"), a remedy authorized by contract clause B8.21,[4] and second, the reduction and/or refund of plaintiff's downpayments through a Temporary Reduction in Downpayment ("TRD"), a remedy authorized by contract clause C.4222.[5]

On May 11, 1994, the Fish and Wildlife Service issued a final biological opinion concerning the 318 timber sales, including the Forest Service's proposed timber sales from

achieve this goal, section 7 and its implementing regulations set forth a detailed consultation process. *See* 16 U.S.C. § 1536(b); 50 C.F.R. pt. 402.

3. Indeed, Scott's contracts remain suspended at the date of this opinion, except that the Forest Service has allowed Scott to harvest timber from a number of units, including the following: Cat Track (units 1–5); Raspberry (units 3, 6, 7, 9. 13, 18, 35, 38); Maria Skyline (units 1, 2); Toastberry (units 3, 4); and Father Oak (units 13, 16). According to plaintiff's counsel, Scott Timber has to date harvested approximately 35% of the volume of timber that was scheduled to be harvested from the sale areas at issue.

4. Clause B8.21 permits an adjustment of the contract termination date when the purchaser "experiences delays in starting scheduled operations or interruption in active operations ... due to causes beyond Purchaser's control, including ... acts of Government...."

5. Clause C4.222 provides, in part, that "[w]hen Contracting Officer requests Purchaser to interrupt or delay removal operations for more than 60 consecutive days during the Normal Operating Season as the result of a court order or injunction. Purchaser's downpayment may be reduced."

the Siskiyou and Siuslaw National Forests that are at issue in this case. Under the heading "Reasonable and Prudent Alternatives,"[6] FWS's May 1994 biological opinion contained the following recommendations:

PART 1.

The following applies to the timber sales that have at least one unit located in stands of suitable marbled murrelet habitat that have been found to be occupied by marbled murrelets:

The [Fish & Wildlife] Service and Forest Service have not been able to identify a reasonable and prudent alternative.

PART 2.

The following applies to all timber sales ... that contain suitable habitat and have not been surveyed to protocol, except for those described in PART 1 above:

Complete the surveys for marbled murrelets according to the 2–year protocol (Ralph et al.1993). The sale may proceed if the sale units are determined not to be occupied. If the stands in which the sale units occur are determined to be occupied, no reasonable and prudent alternative has been identified for sales.

(Def.'s Supp.App. at 0773.)

According to the final biological opinion, seven of the sales at issue in this case—Beamer 712, Formader 103, Formader 717, Indian Hook, Maria Skyline, Skywalker, and Wapiti 305—had been surveyed and were determined to be occupied by marbled murrelets. The remaining four sales at issue in this case—Raspberry, Cat Track, Father Oak, and Toastberry—were determined to contain suitable marbled murrelet habitat, but had not yet been surveyed to determine whether these sale areas were in fact occupied by murrelets.

On November 4, 1994, Scott Timber and a number of other timber companies filed a lawsuit in the United States District Court for the District of Oregon challenging the Fish and Wildlife Service's May 11, 1994

biological opinion. *See CLR Timber Holdings, Inc. v. Babbitt,* No. 94–6403–TC (D.Oregon). In *CLR Timber,* Scott and the other timber companies argued that FWS did not comply with various requirements of the Endangered Species Act, 16 U.S.C. § 1531 *et seq.,* and its accompanying regulations. Scott and the other timber companies therefore requested that the district court set aside the May 11, 1994 biological opinion and compel FWS to reanalyze and reissue the opinion in compliance with the requirements of the Endangered Species Act. Ultimately, however, *CLR Timber* was settled and dismissed without prejudice.

Throughout the end of 1994 and into 1995, the Forest Service sought technical assistance from FWS to determine if it was possible to reconfigure the proposed Section 318 timber sales so that timber purchasers could begin harvesting timber in areas that were not occupied by marbled murrelet. In addition, on February 8, 1995, the Forest Service reinitiated formal consultations with FWS with respect to three particular Section 318 sale areas that are not at issue in this case. In response to this request, FWS took the initiative to prepare an amended biological opinion addressing all of the remaining Section 318 sales, including the 11 sales at issue in this case. A draft of this amended opinion was forwarded from FWS to the Forest Service on March 24, 1995, and on April 21, 1995, the Forest Service provided FWS with a response that summarized various applicant comments.

Finally, on June 12, 1995, FWS released a final amended biological opinion concerning the 77 remaining Section 318 timber sales. Under the heading "Reasonable and Prudent Alternatives," this amended opinion contained three recommendations. First, with respect to sale areas where at least one unit located in suitable marbled murrelet habitat was actually determined to be occupied by murrelet, the amended opinion recommended

6. Reasonable and prudent alternatives are defined in 50 C.F.R. § 402.02, as "alternative actions identified during formal consultation that can be implemented in a manner consistent with the intended purpose of the action, that can be implemented consistent with the scope of the

Federal agency's legal authority and jurisdiction, that [are] economically and technologically feasible, and that the Director believes would avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat."

that the Forest Service "[c]ancel, suspend, or take action to otherwise withdraw from harvest, units determined to be occupied by marbled murrelets." (Def.'s Supp.App. at 0882.) Second, with respect to those areas that contained suitable murrelet habitat but for which murrelet occupancy was yet to be determined, FWS recommended that the Forest Service "[d]etermine murrelet occupancy of suitable habitat. The sale may proceed if all suitable murrelet habitat contained in the sale is determined to be unoccupied or when the sale is reconfigured to allow harvest of only unoccupied murrelet habitat." (Def.'s Supp.App. at 0882.) Finally, with respect to sale areas where all of the units of suitable habitat were found to be occupied by murrelet, FWS was unable to identify any reasonable and prudent alternatives.

## PROCEDURAL HISTORY

On June 23, 1994, Scott submitted formal claims to the contracting officer ("CO") under the Contract Disputes Act ("CDA"), alleging that the Forest Service's continued suspension of Scott's timber contracts constituted a breach of contract for which the Forest Service was liable for damages. The arguments advanced by Scott in its CDA claims were virtually identical to its argument before this Court. Specifically, Scott argued that the Forest Service did not possess the contractual authority to suspend any of the contracts at issue for an extended and indefinite period of time, and that the Forest Service's continued suspension of the contracts therefore violated the government's duty not to unduly hinder Scott's performance of the contracts. Consequently, Scott sought breach of contract damages equal to the cost of obtaining replacement timber on the open market. The CO denied each of Scott's breach of contract and damage claims, however, and the earlier suit involved here was filed in the Court of Federal Claims on October 27, 1994.

## DISCUSSION

Plaintiffs have moved for summary judgment on five of the eleven contracts, arguing that the Forest Service's suspension of those contracts amounts to a breach of the government's implied duty to cooperate and not hinder plaintiff's performance of the contracts. The government has filed a cross-motion for summary judgment on all 11 contracts, arguing first that the government did not breach the contracts at issue because all 11 of the contracts permitted the government to suspend plaintiff's performance, and second, that the government is shielded from liability for any alleged breach of contract in this case under the sovereign acts defense.

Summary judgment is appropriate in cases where there are no genuine issues of material fact in dispute, and the moving party is entitled to judgment as a matter of law. *See* RCFC 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987). Where both parties have moved for summary judgment, as they have in this case, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors*, 812 F.2d at 1391.

### I. Jurisdiction

As a preliminary matter, defendant argues that this Court lacks jurisdiction under the Contract Disputes Act to consider certain aspects of plaintiff's claims because these issues allegedly were not raised in plaintiff's claims to the CO. *See Cerberonics, Inc. v. United States*, 13 Cl.Ct. 415, 417 (1987) ("[A]n action in [the Court of Federal Claims] brought under [the CDA] must be based on the *same claim* previously presented to and denied by the contracting officer." (emphasis added) (citing *Mark Smith Constr. Co. v. United States*, 10 Cl.Ct. 540, 546 (1986))); *see also* 41 U.S.C. §§ 605(a), 609(a)(1), 609(a)(3). This Court disagrees. This is not a case where plaintiff is asserting an entirely new claim before this Court. Even if plaintiff's claim before this Court contains slightly different legal arguments than the claims plaintiff submitted to the CO, the basic theory underlying plaintiff's claim in this case is essentially the same as the theory that was presented to the CO—namely, that the Forest Service's suspension of

plaintiff's contracts was wrongful, and therefore a breach of the contracts. In addition, the relief sought in this case is essentially the same relief that plaintiff sought in its claim to the CO—specifically, consequential damages for the government's alleged breach of its contracts with plaintiff. Finally, plaintiff's claims in this case arise from the same set of operative facts as plaintiff's claims to the CO—specifically, the Forest Service's allegedly wrongful suspension of plaintiff's contracts. Based on these factors, the Court concludes that plaintiff's claim in this case is the same basic claim that was pursued before the CO, and therefore plaintiff's case falls within this Court's jurisdiction. *See Thermocor, Inc. v. United States*, 35 Fed.Cl. 480, 489–90 (1996) (contractor's claim was properly asserted in Court of Federal Claims where both claims were based on same basic theory, arose from same operative facts, and sought same relief, even though contractor augmented the legal theories underlying its claim in Court of Federal Claims); *Cerberonics*, 13 Cl.Ct. at 419 (same).

## II. The Forest Service's Contractual Authority to Suspend Plaintiffs Contracts

The primary issue presented by the parties' cross-motions for summary judgment is whether the Forest Service possessed contractual authority to suspend plaintiffs performance under the contracts. Plaintiff has moved for summary judgment on the issue of liability with respect to five of the contracts—Toastberry, Father Oak, Beamer 712, Formader 717, and Indian Hook—arguing that the Forest Service did not possess any contractual authority to unilaterally suspend Scott's operations under these five contracts. In its cross-motion for summary judgment, the government contends that four contract provisions—clauses C6.0, C6.01, C6.25, and B8.21—authorized the Forest Service to suspend all 11 of plaintiff's contracts. Therefore, the government argues, the Forest Service's suspension of plaintiff's contracts was not a breach.

### A. Contract Clause C6.01

Six of the contracts at issue in this case—Cat Track, Raspberry, Formader 103, Maria Skyline, Skywalker, and Wapiti 305—contain the following clause:

C6.01—INTERRUPTION OR DELAY OF OPERATIONS. (6/90) Purchaser agrees to interrupt or delay operations under this contract, in whole or in part, upon the written request of Contracting Officer:

(a) To prevent serious environmental degradation or resource damage that may require contract modification under C8.3 or termination pursuant to C8.2;

(b) To comply with a court order, issued by a court of competent jurisdiction; or

(c) Upon determination of the appropriate Regional Forester, Forest Service, that conditions existing on this sale are the same as, or nearly the same as, conditions existing on sale(s) named in such an order as described in (b).

Purchaser agrees that in event of interruption or delay of operations under this provision, that its sole and exclusive remedy shall be (1) Contract Term Adjustment pursuant to B8.21, or (2) when such an interruption or delay exceeds 30 days during Normal Operating Season, Contract Term Adjustment pursuant to B8.21, plus out-of-pocket expenses incurred as a direct result of interruption or delay of operations under this provision. Out-of-pocket expenses do not include lost profits, replacement cost of timber, or any other anticipatory losses suffered by Purchaser.

In moving for summary judgment, the government argues that clause C6.01 explicitly authorized the Forest Service to suspend Scott's performance under the particular circumstances of this case.[7] The record in this case shows that the Forest Service's decision to suspend Scott's contracts on September 17, 1992 was prompted by a Temporary Restraining Order that was issued by the United States District Court for the Western District of Washington on September 16, 1992. The Court finds that this initial suspension was clearly authorized by contract

---

7. Plaintiff has not moved for summary judgment on the contracts containing clause C6.01.

clause C6.01(b), which vests the Forest Service with the power to suspend the contracts if necessary "[t]o comply with a court order."

However, the record also shows that the Forest Service continued to hold Scott's contracts in suspension even after the district court's September 16, 1992 order expired. Defendant argues that once the marbled murrelet was added to the list of threatened species, the continued suspension of plaintiffs contracts was required to permit the Forest Service to complete environmental consultations with the Fish and Wildlife Service as required by section 7 of the Endangered Species Act.[8] According to defendant, the continued suspension of plaintiffs contracts was simply designed to "preserve[ ] marbled murrelet habitat and maintain[ ] the status quo on the ground while the Forest Service and FWS engaged in the consultation process required by law, and while the Forest Service implemented FWS's biological opinion." (Def.'s Cross–Motion for Summary Judgment at 26.)

The Court agrees with defendant that, to the extent that plaintiffs contracts were held in a state of suspension to permit the Forest Service to consult with FWS, the suspension was consistent with the Forest Service's obligations under section 7 of the ESA. In particular, continued suspension of the contracts was appropriate to maintain the status quo—that is, in the jargon of the ESA, to prevent the Forest Service and plaintiff Scott Timber[9] from making an "irreversible or irretrievable commitment of resources"— while the Forest Service consulted with FWS. *See Conner v. Burford,* 836 F.2d 1521, 1536 n. 34 (9th Cir.1988); 16 U.S.C. § 1536(a)(2), (d).

More importantly for purposes of this contract action, however, the Forest Service's continued suspension of plaintiff's contracts was authorized by contract clause C6.01(a). Under C6.01(a), the Forest Service possesses the right to "interrupt or delay operations" under the contracts "to prevent serious environmental degradation or resource damage." This Court reads clause C6.01(a) to authorize the Forest Service to do precisely what it did in this case—that is, C6.01(a) authorized the Forest Service to suspend plaintiff's contracts while the Service consulted with the Fish and Wildlife Service to determine whether the proposed sales would adversely impact the marbled murrelet and/or its habitat. By exercising this contractual authority, the Forest Service avoided any potential harm to marbled murrelets or their habitat that might have occurred if plaintiff was permitted to harvest timber before the consultation process was complete. *See Thomas Creek Lumber & Log Co. v. United States,* 32 Fed.Cl. 787, 790–91 (1995) ("[S]uspension maintains the status quo until an appropriate

---

8. Section 7(a)(2) of the Endangered Species Act ("ESA"), 16 U.S.C. § 1536(a)(2), dictates that every federal agency—including the Forest Service—must consult with FWS before undertaking any activity that may adversely impact a species that is listed as threatened or endangered. As explained in *Sierra Club v. Babbitt,*

[S]ection 7(a)(2) of the ESA imposes a procedural duty on Federal agencies to consult with [FWS] before engaging in a discretionary action which may affect a protected species. The purpose of the consultation procedure is to allow FWS to determine whether federal action is likely to jeopardize the survival of a protected species or result in the destruction or adverse modification of its critical habitat and, if so, to identify reasonable and prudent alternatives which will avoid the action's unfavorable consequences.

*Sierra Club v. Babbitt,* 65 F.3d 1502, 1504–05 (9th Cir.1995) (citations omitted).

In addition, section 7(d) of the ESA mandates that "[a]fter initiation of consultation required under [section 7(a)(2)], the Federal agency and the ... applicant shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternatives." 16 U.S.C. § 1536(d). As one court explained, section 7(d) "clarifies the requirements of section 7(a), ensuring that the status quo will be maintained during the consultation process." *Conner v. Burford,* 836 F.2d 1521, 1536 n. 34 (9th Cir. 1988).

9. Defendant points out that, as an applicant in the consultation process, Scott Timber was also prohibited from making any irreversible or irretrievable commitment of resources. *See* 16 U.S.C. § 1536(d) ("After initiation of consultation required under [section 7(a)(2)], the Federal agency *and the permit or license applicant* shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternatives." (emphasis added)).

analysis can be made regarding the effect that continued timber harvesting in the area may have on the endangered animal.... Continued harvesting under such circumstances could potentially destroy an endangered animal and/or its critical habitat. This would seem precisely the type of environmental harm that [the suspension clause] was intended to protect against."), *aff'd*, 73 F.3d 379 (Fed.Cir.1995) (Table).

■ The Forest Service did not, however, possess *unlimited* authority to suspend plaintiff's contracts. First, contract clause C6.01 only authorizes the Forest Service to suspend the contracts "to prevent serious environmental degradation or resource damage *that may require contract modification under C8.3 or termination pursuant to C8.2.*" (emphasis added). Thus, clause C6.01 does not authorize the Forest Service to indefinitely or permanently suspend the contracts once the Forest Service has gathered all of the information required to make a decision to cancel, modify, or go forward with the sales.

■ In addition, plaintiff correctly posits that the Forest Service was under an implied duty to act reasonably in exercising its discretion under clause C6.01 to suspend the contracts. *See Thomas Creek*, 32 Fed.Cl. at 790 ("It is a well-established principle of law that a party vested with contractual discretion must exercise his discretion reasonably and may not do so arbitrarily and capriciously." (internal quotations omitted)). Therefore, to determine whether the Forest Service's protracted suspension of plaintiff's contracts amounted to a breach, this Court must determine whether the suspension was reasonable. *See Thomas Creek*, 32 Fed.Cl. at 790 ("[T]he court must determine whether the authorized BLM officer acted *reasonably* in his disputed decisions to suspend harvesting on the ... contract site and to delay authorizing the resumption of harvesting on the ... contract sites." (emphasis added)). Before turning to the reasonableness of the suspension, however, the Court must first consider whether any other contract provisions bestowed the Forest Service with contractual authority to suspend those contracts that do not contain clause C6.01.

## B. Contract Clause C6.25

■ All 11 timber sale contracts at issue in this case contain the following clause:

C6.25# —PROTECTION OF HABITAT OR ENDANGERED, THREATENED, AND SENSITIVE SPECIES. (9/89) Location of areas needing special measures for protection of plants or animals listed as threatened or endangered ... or as sensitive ... are shown on Sale Area Map and identified on the ground. Measures needed to protect such areas have been included elsewhere in this contract or are as follows:

\* \* \* \* \* \*

If protection measures prove inadequate, if other such areas are discovered, or if new species are listed as Federally threatened or endangered or as sensitive by the Regional Forester, Forest Service may either cancel the contract under C8.2 or unilaterally modify this contract to provide additional protection regardless of when such facts become known.

In the event of modification under this Subsection, Purchaser shall be reimbursed for any additional protection required by the modification.... Amount of reimbursement ... shall be in the form of a reduction in Current Contract Rates unless agreed otherwise in writing.

The Court agrees with the government that, by granting the Forest Service explicit authority to unilaterally cancel or modify the contracts for the protection of endangered or threatened species, clause C6.25 implicitly granted the Forest Service authority to suspend the contracts. A common sense reading of clause C6.25 dictates that, once a species is added to the list of endangered or threatened species, or once a listed species is discovered on a sale area, the Forest Service must be afforded some reasonable amount of time to determine whether to cancel, modify, or go forward with the sale. Any other interpretation would essentially render the Forest Service's authority to modify or cancel a sale under clause C6.25 meaningless, particularly in light of the Forest Service's obligations under section 7 of the ESA to

consult with FWS before pursuing actions which might adversely impact endangered or threatened species. ○ *See* 16 U.S.C. § 1536(a)(2), (d); *see also supra* note 9.

The record in this case shows that the Forest Service's initial decision to suspend plaintiff's contracts was prompted by the addition of the marbled murrelet to the federal list of threatened species. In addition, the record shows that the suspension continued so that the Forest Service could consult with FWS, as required by section 7 of the ESA, to determine what impact the proposed sales would have on the marbled murrelet and its habitat, and also to determine whether there were any reasonable and prudent alternatives to the proposed sales. *See* 16 U.S.C. § 1536(d). It is clear from this record that the continued suspension of plaintiff's contracts was necessary to permit the Forest Service to determine whether to exercise its contractual right to cancel or modify the sales under clause C6.25. Therefore, the Court concludes, the Forest Service's continued suspension of plaintiff's contracts was implicitly authorized by clause C6.25.[10] Consequently, plaintiff's motion for summary judgment on these contracts must be denied.

However, clause C6.25 did not vest the Forest Service with *unlimited* authority to suspend plaintiff's contracts. First, the Forest Service's authority to suspend the contracts is incidental to the Forest Service's authority to cancel or modify the contracts under clause C6.25. Therefore, clause C6.25 only authorizes suspension while the Forest Service, in consultation with FWS, determines whether to cancel or modify the contracts. Consequently, clause C6.25, like clause C6.01, cannot be construed to permit the Forest Service to indefinitely or permanently suspend the contracts once the Forest Service has gathered all of the information required to make a decision to cancel, modify, or go forward with the sales.

In addition, our cases have made clear that the government will be held liable for breach of contract in those cases where the government's exercise of its contractual right to make changes results in an unreasonable delay. *See, e.g., F.H. McGraw & Co. v. United States,* 131 Ct.Cl. 501, 130 F.Supp. 394, 397 (Ct.Cl.1955) ("It is settled that the [government] is allowed under the contract only a reasonable time within which to make permitted changes in the specifications and that the [government] is liable for breach of its contract if it unreasonably delays or disrupts the contractor's work."); *Anthony P. Miller, Inc. v. United States,* 111 Ct.Cl. 252, 77 F.Supp. 209, 212 (Ct.Cl.1948) ("[A] sensible reading of [the contract's changes] provision does not give [the government] the right to deliberate, in disregard of the interests of the other party to the contract, for as long as it pleases, upon changes so fundamental that the work can go forward only haltingly and uneconomically until [the government's] deliberations are concluded."). Before turning to the reasonableness of the government's suspension in this case, the Court will briefly consider whether any other contract provisions provided a basis for the government to suspend plaintiff's contracts.

### C. Contract Clause C6.0

■ All 11 contracts at issue in this case contain a version of clause C6.0, entitled "Operations." The five contracts for which Scott seeks partial summary judgment—Toastberry, Father Oak, Beamer 712, Formader 717, and Indian Hook—contain the following version of clause C6.0:

> C6.0—OPERATIONS. (3/74) This contract may be terminated by Forest Service upon Purchaser's conviction for a violation of criminal statutes or for violation of civil standards, orders, permits, or other regulations for the protection of environmental quality issued by a Federal agency, State

---

**10.** This conclusion is consistent with a long line of cases holding that the government is not liable for breach of contract for delays caused by the government's exercise of its contractual right to make changes to a contract. *See Bruno Law v. United States,* 195 Ct.Cl. 370, 383, 1971 WL 17828 (1971) ("[N]o damages can be recovered for the exercise by [the government] of its reserved contract right to make changes and, con-

sequently, for the extra time required to perform the changed work."); *J.A. Ross & Co. v. United States,* 126 Ct.Cl. 323, 115 F.Supp. 187, 191 (Ct.Cl.1953) ("For any necessary delays resulting from the exercise by the Government of some reserved right there is no liability." (citing *Parish v. United States,* 120 Ct.Cl. 100, 98 F.Supp. 347 (Ct.Cl.1951); *Stafford v. United States,* 109 Ct.Cl. 479, 74 F.Supp. 155 (Ct.Cl.1947))).

agency, or political subdivision thereof in the conduct of operations thereunder on National Forest lands.

The remaining contracts contain the following version of clause C6.0:

C6.0—OPERATIONS. (6/90) Purchaser agrees to conduct its operations under this contract ... in compliance with Federal, State and local statutes, standards, orders, permits, or other regulations.

The government argues that, despite their differing language, both versions of clause C6.0 authorized the Forest Service to suspend plaintiff's contracts. This Court disagrees. Although both versions of clause C6.0 may authorize termination of the contracts—in version 3/74, this authority is explicitly granted to the Forest Service, while in version 6/90 the authority to terminate is, perhaps, implicitly granted—neither version of clause C6.0 can be construed to either explicitly or implicitly authorize suspension of the contracts. Furthermore, any authority conferred on the Forest Service by virtue of clause C6.0 would only arise *after* the contractor had committed a violation of law. The Court therefore rejects defendant's argument that the Forest Service's suspension of plaintiff's contracts under the circumstances of this case was authorized by clause C6.0 of the contracts.

### D. Contract Clause B8.21

■ Finally, all 11 contracts at issue contain the following clause:

B8.21 Contract Term Adjustment. "Contract Term Adjustment" means adjustment only as provided immediately above and for the three circumstances described in this Subsection. Under said circumstances, the contract term shall be adjusted in writing to include additional calendar days in one or more Normal Operating Seasons equal to the actual time lost, except as limited by (b) below.

\* \* \* \* \* \*

The three circumstances qualifying for a Contract Term Adjustment are:

(a) Purchaser experiences delay in starting scheduled operations or interruption in active operations either of which stops re-

moval of Included Timber from Sale Area ... for 10 or more consecutive calendar days during a Normal Operating Season due to causes beyond the Purchaser's control, including but not limited to acts of God, acts of the public enemy, acts of Government, labor disputes, fires, insurrections or floods.

\* \* \* \* \* \*

The government argues that this clause authorized the Forest Service's suspension of plaintiff's contracts. Again, this Court disagrees. Although B8.21 may contemplate the possibility that the government might delay plaintiff's performance of the contracts, clause B8.21 does not provide authority for the Forest Service to unilaterally suspend the contracts. As previously explained above, the government's authority to suspend the contracts is defined in clauses C6.01 and C6.25. Clause B8.21, by contrast, provides for a particular result when contract performance is delayed. Therefore, the Court rejects the government's argument that the Forest Service's unilateral suspension of plaintiff's contracts under the circumstances of this case was authorized by clause B8.21 of the contracts.

### III. Reasonableness of the Government's Unilateral Suspension

Although the Forest Service possessed contractual authority to unilaterally suspend plaintiff's performance under clauses C6.01 and C6.25, both clauses require that the Forest Service exercise this authority reasonably. In this case, plaintiff argues that the Forest Service did not act reasonably in exercising its authority to suspend plaintiff's contracts. First, plaintiff challenges the duration of the suspension period. Second, plaintiff contends that the Forest Service's suspension of the contracts was unreasonable because the Forest Service failed to take adequate measures to protect the marbled murrelet before advertising the timber sales at issue in this case.

### A. Duration of the Suspension Period

■ Plaintiff first argues that the Forest Service's suspension of the contracts, which was undertaken to permit the Forest Service to consult with FWS, was unreasonable be-

cause the consultations were not concluded within the time period specified by the ESA. Plaintiff maintains that, under section 7(b) of the ESA, the period for consultations between a federal agency and FWS cannot exceed 150 days unless the agency obtains the consent of the applicant. *See* 16 U.S.C. § 1536(b)(1). In this case, plaintiff argues that the Forest Service continued to engage in consultations with FWS for an additional three years after the expiration of the 150–day period permitted in the statute, without obtaining Scott Timber's consent to extend the consultations. According to plaintiff, the Forest Service's alleged failure to comply with the statute is evidence that the suspension was unreasonable.

The Court rejects plaintiff's argument that the duration of the suspension period was unreasonable, even if the suspension period did exceed the statutory period set forth in section 7 of the ESA. First, the Court notes that the extended duration of the suspension period is attributable, at least in part, to the actions of plaintiff Scott Timber. In particular, Scott's participation in the consultation process and its judicial challenge to FWS's final biological opinion undoubtedly delayed the issuance of a final biological opinion and thereby prolonged the consultation process.

More importantly for purposes of this case, however, the Forest Service's obligation to complete the consultation process within 150 days arose, if at all, under section 7(b) of the ESA and not under the contracts at issue in this breach of contract case. Plaintiff has not identified any clause in the contract that could be construed to incorporate the ESA requirements into the contract. Therefore, the Court rejects any suggestion that the Forest Service's alleged failure to comply with the time period set forth in the ESA constitutes a breach of the contracts at issue in this case. *See Smithson v. United States,* 847 F.2d 791, 794–95 (Fed.Cir.1988) (rejecting contractor's argument that violation of government regulations evidenced a breach of contract where contractor failed to adduce evidence that government regulations at issue formed an integral part of the contract); *Thomas Creek Lumber & Log Co.,* 32 Fed.Cl. at 792 (same).

## B. The Forest Service's Design of the Sales

Plaintiff also argues that the Forest Service's suspension of plaintiff's contracts was unreasonable because the Forest Service failed to take appropriate measures to protect the marbled murrelet when designing the sales at issue in this case. Plaintiff argues that, under clause C6.25 of the contracts, the Forest Service assumed a contractual duty to design the sales in a manner that would adequately protect the marbled murrelet. Plaintiff also contends that, under clause C6.25, the Forest Service warranted that any protection measures were based on all information that was available to the Forest Service at the time the sales were designed. However, plaintiff alleges that at the time the sales were designed, the Forest Service possessed significant information concerning the presence of the marbled murrelet on the sale areas at issue in this case, but the Forest Service failed to properly take this information into account when designing the sales. As a result, plaintiff contends that the Forest Service's post award suspension of the contracts was unnecessary and unreasonable.

Contract clause C6.25—a clause contained in all of the contracts at issue in this case—provides in part:

> [L]ocation of areas needing special measures for protection of plants or animals listed as threatened or endangered ... or as sensitive ... are shown on Sale Area Map and identified on the ground. Measures needed to protect such areas have been included elsewhere in this contract or are as follows:
>
> \* \* \* \* \* \*
>
> If protection measures prove inadequate, if other such areas are discovered, or if new species are listed as Federally threatened or endangered or as sensitive by the Regional Forester, Forest Service may either cancel the contract under C8.2 or unilaterally modify this contract to provide additional protection regardless of when such facts become known.

The Court agrees with plaintiff that clause C6.25 warranted that the Forest Service had

taken adequate measures to protect sensitive species such as the marbled murrelet when designing the sales. Furthermore, plaintiff and all other bidders on the sales were entitled to reasonably rely on the Forest Service's representation in clause C6.25 that there were no areas requiring special measures to protect any sensitive species—including the marbled murrelet—in formulating their bids.

■ Despite the plain language of clause C6.25, and despite the marbled murrelet's status as a sensitive species, defendant argues that the Forest Service had no duty to protect the marbled murrelet at the time the Forest Service designed the sales at issue in this case. Defendant acknowledges that under the National Forest Management Act ("NFMA"), 16 U.S.C. § 472a *et seq.*, and its implementing regulations, the Forest Service is normally under a duty to ensure viable populations of sensitive species. *See* 16 U.S.C. § 1604(g)(3)(B); 36 C.F.R. § 219.19. In this case, however, defendant argues that the Forest Service's obligations to protect sensitive species such as the marbled murre-

let was excused by Section 318 of the Department of the Interior Appropriations Act of 1990, Pub.L. No. 101–121, 103 Stat. 741 (1989). Defendant contends that "[b]ecause the sales at issue [in this case] complied with subsection (b)(3) of Section 318, Congress deemed that these sales complied with NFMA, ... and, therefore, complied with any viability requirements for the marbled murrelet." (Def's Reply at 20–21.)[11] Defendant contends that other portions of Section 318, such as subsection (c)(2)[12] and subsection (b)(6)(A),[13] also discharged the Forest Service's obligation to ensure the viability of sensitive species such as the murrelet in designing the sales at issue in this case.

■ The Court rejects defendant's argument that Section 318 discharged the Forest Service's obligation to protect sensitive species such as the marbled murrelet in designing the sales at issue in this case. Indeed, this Court sees no indication in the plain language of Section 318, or in the legislative history accompanying Section 318, that supports defendant's sweeping interpretation.

11. Section 318(b)(3) provides in part:

No timber sales offered pursuant to this section for the thirteen national forests in Oregon and Washington known to contain northern spotted owls may occur within SOHAs [Spotted Owl Habitat Areas] identified pursuant to the Final Supplemental to the Environmental Impact Statement for an Amendment to the Pacific Northwest Regional Guide—Spotted Owl and the accompanying Record of Decision ... as adjusted by this subsection ... (D) For the Oregon Cast Range Province, which includes the Siuslaw National Forest, SOHA size is to be 2,500 acres; and (E) For the Klamath Mountain Province, which includes the Siskiyou National Forest, SOHA size is to be 1,250 acres.

12. Section 318(c)(2) provides that, in designing Section 318 sales,

the Forest Service ... shall consider the recommendations of the advisory boards once such boards are established pursuant to this section, including any suggested modifications of individual sales. The Forest Service ... shall also consider recommendations made by the United States Fish and Wildlife Service on these timber sales conferred upon under section 7(a)(4) or, if the spotted owl is listed as a threatened or endangered species, consult under section 7(a)(2) of the [ESA].... Adoption or rejection of such recommended modification shall not require preparation of additional

environmental documents, notwithstanding any other provision of law.

13. Section 318(b)(6)(A) provides in part:

[T]he Congress hereby determines and directs that management of areas according to subsections (b)(3) and (b)(5) of this section on the thirteen national forests in Oregon and Washington and Bureau of Land Management lands in western Oregon known to contain northern spotted owls is adequate consideration for the purpose of meeting the statutory requirements that are the basis for the consolidated cases captioned *Seattle Audubon Society et al., v. F. Dale Robertson,* Civil No. 89–160 and *Washington Contract Loggers Assoc. v. F. Dale Robertson,* Civil No. 89–99 (order granting preliminary injunction) and the case *Portland Audubon Society et al., v. Manuel Lujan, Jr.,* Civil No. 87–1160–FR. The guidelines adopted by subsections (b)(3) and (b)(5) of this section shall not be subject to judicial review by any court of the United States.

Each of the cases identified by Congress in Section 318(b)(6)(A)—*Seattle Audubon Society, Washington Contract Loggers,* and *Portland Audubon Society*—involved allegations that certain timber sales afforded too much, or too little, protection to the northern spotted owl. *See Robertson v. Seattle Audubon Society,* 503 U.S. 429, 432–33, 112 S.Ct. 1407, 1410–11, 118 L.Ed.2d 73 (1992).

As defendant points out, the legislative history of Section 318 indicates that this law was designed to "set[ ] terms and conditions applicable only *for fiscal year 1990 for making timber sales on Federal lands in Oregon and Washington, for managing habitat for northern spotted owls, and for minimizing fragmentation of significant old growth stands.*" H.R. Conf. Rep. No. 264, 101st Cong., 1st Sess. 7 (1989) (emphasis added) (quoted in Def.'s Reply at 19). Defendant also points out that the purpose of Section 318 was to "balance the goals of ensuring a predictable flow of timber for fiscal year 1990 and *protecting the northern spotted owl and significant old growth forest stands.*" *Id.* (emphasis added) (quoted in Def.'s Reply at 19–20). As these statements indicate, Section 318 aimed to balance the needs of the timber industry against the protection of the northern spotted owl and old growth forests. Section 318 did not address the protection of sensitive species *other than the spotted owl,* such as the marbled murrelet. Therefore, Section 318 cannot be construed as a blanket waiver of the Forest Service's obligations to protect sensitive species such as the marbled murrelet. Plaintiff has therefore raised a genuine issue of material fact as to whether the Forest Service's suspension of plaintiff's contracts was unnecessary and unreasonable because the Forest Service failed to design the sales with adequate protections for the marbled murrelet. Therefore, summary judgment on the issue of liability for either party is inappropriate at this time.

### IV. Sovereign Acts Defense

Finally, in moving for summary judgment the government argues that it is shielded from liability for any alleged breach of its contracts with plaintiff under the sovereign acts defense. The government argues that numerous acts—the listing of the marbled murrelet, the district court's temporary restraining order, and the actions of the Forest Service pursuant to the ESA and its implementing regulations—were "sovereign acts" which precluded plaintiff from harvesting timber on the Siskiyou and Siuslaw Forests, and which required that the Forest Service suspend plaintiff's contracts. Therefore, the government argues that the Forest Service cannot be held liable for breaching its contracts with plaintiff Scott Timber.

The sovereign acts doctrine or defense has long been applied by this court, and its predecessor courts, to shield the United States from liability for breach of contract when the United States, by virtue of a "sovereign act," impairs the performance of a contract to which the United States is a party. *See Horowitz v. United States,* 267 U.S. 458, 461, 45 S.Ct. 344, 344–45, 69 L.Ed. 736 (1925). The essence of the sovereign acts defense is the notion that "the United States as contractor cannot be held liable directly or indirectly for the public acts of the United States as a sovereign." *Jones v. United States,* 1 Ct.Cl. 383, 385 (1865); *see also Horowitz,* 267 U.S. at 461, 45 S.Ct. at 344 ("[T]he United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign.").

As the Supreme Court's recent decision in *United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (plurality) demonstrates, application of the sovereign acts doctrine essentially involves a two-step analysis. First, the court must ask whether the action that impedes the government's performance of the contract is in fact a "sovereign act," that is, whether the act is "public and general" and therefore attributable to the government as sovereign. *See Winstar,* 518 U.S. at 895–98, 116 S.Ct. at 2465–66; *see also Horowitz,* 267 U.S. at 461, 45 S.Ct. at 344–45; *O'Neill v. United States,* 231 Ct.Cl. 823, 826, 1982 WL 25241 (1982). An act of government is considered public and general, in turn, so long as the impact on public contracts is "merely incidental to the accomplishment of a broader governmental objective." *Winstar,* 518 U.S. at 898, 116 S.Ct. at 2466; *see also O'Neill,* 231 Ct.Cl. at 826 (noting that the sovereign acts doctrine recognizes that "the Government's actions, otherwise legal, will occasionally *incidentally impair* the performance of contracts" (emphasis added)).

If the court finds that the government action which prevents performance of the contract is, in fact, attributable to the government as sovereign, then the court must determine in the second step of its analysis whether the government as contractor should be discharged from liability under the common law doctrine of impossibility. *See Winstar*, 518 U.S. at 903–05, 116 S.Ct. at 2469. To successfully show that the government should be shielded from liability under the impossibility defense, "the Government, like any other defending party in a contract action, must show that [the sovereign act] rendering its performance impossible was an event contrary to the basic assumption of the parties." *Id.* at 904, 116 S.Ct. at 2469. Put differently, to satisfy the second prong of the sovereign acts defense, the government must show that the "nonoccurrence of [the sovereign act] was a basic assumption of the[ ] contract[ ]." *Id.* (citing Restatement (Second) of Contracts § 261).

 Although plaintiff in this case conceded at oral argument that the listing of the marbled murrelet was a sovereign act, thereby satisfying the first prong of the sovereign acts defense, the government cannot satisfy the second prong of the defense. In particular, the government cannot establish that the non-occurrence of the listing of the marbled murrelet was a basic assumption of the contract. Quite the contrary, clauses C6.01 and C6.25 of the contracts between plaintiff and the Forest Service show that the parties specifically foresaw the possibility that additional species might be added to the list of endangered or threatened species, that additional protected species might be located on the sale areas, or that performance of the contracts might threaten the existence of protected species. In addition, and as detailed above, clauses C6.01 and C6.25 specifically sets forth the rights and responsibilities of the parties, if any, if those contingencies should arise, as they did in this case. Under these circumstances, the terms of the contracts should control, and the government should not be permitted to shield itself from

any potential liability under the sovereign acts defense. *See Winstar*, 518 U.S. at 906, 116 S.Ct. at 2470 (government not excused from liability under sovereign acts defense where contracts specifically anticipated regulatory changes that caused government to breach its contracts with financial institutions).

## CONCLUSION

For the reasons set forth above, plaintiff's motion for partial summary judgment on the issue of liability is denied. Defendant's cross-motion for summary judgment is also denied.