Per Curiam:
This case was referred to Trial Commissioner W. Ney Evans witb directions to make findings of fact 'and recommendation for conclusions of law under the order of reference and Rule 57(a). The commissioner has done so in an opinion and report filed on December 19, 1967. Exceptions to the commissioner’s findings of fact were filed by plaintiff and exceptions to the commissioner’s findings of fact and recommendation for conclusion of law were filed by defendant. The case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner’s opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case. Therefore, plaintiff is entitled to recover and judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Rule 47(c).
OPINION oe Commissioner
Evans, Commissioner:
Plaintiff undertook a contract with the Navy (acting for the Coast Guard) to build a loran (long-range aid to navigation) station on Marcus Island, a remote atoll in the far Pacific. The contract documents represented that Marcus Island was “* * * well outside the normal typhoon zone.” One damaging typhoon struck the island 3 weeks before the contract was signed, and four other *391 typhoons occurred within the ensuing 12 months of construction. Plaintiff applied to the contracting officer for relief from its extra costs and appealed his denial of the claim to the Armed Services Board of Contract Appeals, which dismissed the appeal for lack of jurisdiction over a claim founded on alleged misrepresentation. Plaintiff thereupon filed suit in this court.
On the basis of the findings of ultimate fact (Findings 8 and 9) it is my opinion that plaintiff is entitled to recover.
FINDINGS on Fact
1. (a) Sometime prior to 1961, the Department of Defense directed the United States Coast Guard to establish a system of loran (long-range aid to navigation) stations in the Far East. Marcus Island was selected as the site of one of the stations.
(b) Marcus Island is a small, isolated coral atoll in the Pacific, 3,200 miles west of Honolulu, 1,200 miles southeast of Tokyo, and 900 miles northeast of Guam. It is triangular in shape and has a land area of approximately 2 square miles. The elevation rises sharply to 20 feet above sea level and is thereafter essentially flat. The vegetation is sparse, consisting mainly of scaviola bushes, small palm trees, and a few dwarf papaya trees. There are no indigenous inhabitants.
(c) During 1961, a site survey of the Island was made by a Coast Guard team of officers and civilians, to assemble engineering and operational data. The Coast Guard officer responsible for the operational section of the site survey included therein data on weather conditions.
(d) Arrangements were made for the Navy to prepare the contract documents, call for bids, negotiate the contract, and supervise the construction.
2. (a) The contract documents, supplied for the preparation of bids, contained the following:
1.34.4 Climatology and Oceanography. — The following information was taken from the weather observation *392 station on Marcus Island, and represents the average conditions over the past ten (10) years:

Marcus Island is considered to be well outside the normal typhoon zone. On only 3 occasions since 1947 have winds exceeded 65 knots.
Tide changes in the boat landing slip average one foot. The current is slight and in a southwesterly direction.
(b) Plaintiff understood the foregoing weather data to mean that the danger of storms of typhoon intensity was relatively remote. No effort was made by plaintiff to supplement the information supplied to it. Plaintiff relied on the data so supplied and made no provision (by way of contingency allowance) for possible storm damage in its bid.
3. (a) Plaintiff’s bid[1] was submitted on or about October 1, 1962. The Navy thereupon convened a board to review the bid, and the plaintiff[2] thereafter (during the next 3 weeks) met with the board on several occasions to discuss in detail its bid back-up and its logistical, mobilization, and construction plans.
(b) On or about October 10,1962, Typhoon Emma passed over Marcus Island, causing substantial damage through deposits of coral on the airstrip and changes in the beach. Plaintiff’s general manager was then in Japan where news *393 of the typhoon reached him and representatives of the Navy. Efforts to reach the Island to survey the damage were unsuccessful over the next 3 weeks.
(c) Negotiations pertaining to the contract were continued, and the contract was signed on October 25, 1962. The contract contained clauses covering changes, changed conditions, and disputes.
(d) Plaintiff’s representatives visited the Island on November 2,1962. On the basis of changes caused by Typhoon Emma, the contractor made claim for extra costs incurred as a result of changed conditions, and the claim was ultimately settled by the payment to plaintiff of $28,000. This claim is not involved in the present suit.
(e) After representatives of the Navy saw the results of Typhoon Emma, substantial changes in the construction plans were initiated by Change Order A. Among these changes were directions for deepening the footings for the buildings from 2 or 3 feet to 11 feet and for extending the seawall, both of which were specifically aimed at protecting the installations from damage by storms of the intensity of Typhoon Emma.
4. (a) Early in May 1963, while construction was under way, Typhoon Olive struck Marcus Island, forcing suspension of the work for a week after the storm had passed. Water supplies were destroyed, the camp was inundated, roofs were blown off buildings, • and forms were wrecked. Similar damage was caused by Typhoons Mamie, on October 17,1963, Ora, on October 27,1963, and Susan, on December 29, 1963.[3]
(b) Plaintiff made claim to the contracting officer for reimbursement of its extra costs. When the claim was denied, plaintiff appealed to the Armed Services Board of Contract Appeals. The board dismissed the appeal for lack of jurisdiction to pass upon a claim based upon alleged misrepresentation.[4]
*394 5. (a) Marcus Island was occupied from 1902 to 1935 by a few Japanese civilians. No weather records were kept.
(b) From 1935 to 1945, Japanese military personnel occupied the Island. Meteorological records were kept and were, ostensibly, available to the Japanese Meteorological Agency mentioned hereafter in paragraph (e) of this finding.
(c) On August 31,1945, the United States Navy accepted Japanese surrender of Marcus Island. In November of the same year, the Navy stationed on the Island a contingent of CBMU (Construction Battalion, Meteorological Unit). A logistics report prepared by this unit, dated March 31,1946, and believed to have been taken from Japanese meteorological records for the 1935-1945 period, referred to 22 typhoons during the preceding 10 years.[5] Sometime in 1947, a typhoon created such havoc on the Island that the Navy contingent was withdrawn.[6]
(d) From 1947 (after the Navy withdrew) through 1950, no one is known to have been on the Island. The United States Air Force, however, flew meteorological missions in the area during this period.
(e) In 1951, the United States Air Force (Far Eastern Coimnand) engaged the Japanese Meteorological Agency by contract to install and maintain a weather observation facility on Marcus Island. This facility was maintained until 1963, when the Coast Guard loran facility took over the work. The reason given by the Air Force for contracting with the Japanese Meteorological Agency was (as recorded by the Agency):
Marcus Island * * * is located in an area of typhoon genesis and development, and is of immeasurable importance in the study of the structure and shape of typhoons.
(f) By international agreement, typhoons or hurricanes are tropical disturbances generating winds equal to or in ex *395 cess of 65 knots (75 miles) per hour. Some of the Japanese data on typhoons, however, is (or was, at the times here material) reported in terms of tropical storms of much less intensity than the standard applied by international agreement.
(g) In 1963, the United States Weather Bureau reported “an average of 3 typhoons * * * yearly” on Marcus Island, and advised plaintiff (in response to a request) that:
Marcus Island is generally considered to be in the typhoon area from July through December, although it is not in the heart of the typhoon belt.[7]
(h) The great advance in meteorological science, through improved facilities for observation, began about 1940. Prior to the availability of aircraft and balloons, weather observation had been largely restricted to mariners’ charts by ships at sea and such observations as could be made from isolated weather posts on remote islands. The war years (1941-1945) gave great impetus to the efforts for better observation and recording, as aids for navigation, surface and air. The ability of aircraft to fly reconnaissance above, around, and even in the eyes of these storms gave the science a tremendous lift.
6. (a) The Coast Guard officer responsible for the operational data in the Marcus Island site survey obtained from the Climatology Division, 1st Weather Wing, United States Air Force (in Japan) a report on Climatological Data for Selected Locations in the Far East. He also consulted the Japanese Meteorological Agency. He did not make inquiry of the Navy or of the United States Weather Bureau. Neither did he seek professional advice from meteorological experts in the reading of the climatological data contained in the report (which was dated December 1961) but relied on his own interpretation thereof.
(b) Table 5 in the report listed the “Number of Typhoon or Tropical Storm Centers Passing Within 100 Nautical Miles of Specified Locations During the 14-Year Period *396 1947-1960.[8] Tbe Coast Guard officer read this table to mean that only three typhoons[9] had passed within 100 nautical miles of Marcus Island during the 14-year period.
(c) The Coast Guard officer obtained from the Japanese Meteorological Agency several graphs showing typhoon tracks in the far Pacific. These graphs indicated to him that the great majority of typhoon tracks were considerably west of Marcus Island.
(d) In his summary of meteorological considerations, the Coast Guard officer inserted the following observation in relation to “Severe Conditions”:
Highest wind conditions come generally during the winter months and specifically with any typhoon or tropical storm that passes nearby. Marcus Island is considered relatively free of serious typhoon threat.
(e) The Navy officer acting for the OICC (Officer in Charge of Construction) who later became the EOICC (Resident Officer in Charge of Construction) translated the Coast Guard officer’s report into the paragraph appearing in the contract documents:
Marcus Island is considered to be well outside the normal typhoon zone. On only 3 occasions since 1947 have winds exceeded 65 knots.
Ahaltsis
7. (a) Plaintiff’s contentions in this case are: (1) that the contractor was warranted in accepting the climatological data in the contract documents at their face value; (2) that the phrase “well outside the normal typhoon zone” (with emphasis on the “well”) meant “definitely” outside; (3) that the original design of the installations, as made by the Coast Guard called for precautions to fit typhoon conditions before the design was modified by the Navy to eliminate such precautions, and that it was the Navy’s design upon which plaintiff bid; (4) that the return by the Navy to the *397 original Coast Guard design, made after Typhoon Emma, reflected changes brought about by the realization, after Typhoon Emma, that Marcus Island could potentially be subjected to wind damage much more serious than anything that previous observations had indicated; (5) that Marcus Island in fact was and is located in an area where typhoons frequently occur and was and is exposed to the danger of extremely high winds and inundation by waves; (6) that this fact was at all times known to the representatives of the defendant charged with the design of the loran station; and (7) that if the Coast Guard and the Navy did not know of the serious typhoon danger at Marcus Island, their representatives were culpably guilty of neglect.
(b) Defendant’s contentions are (1) that there is no credible evidence that defendant had any information concerning weather conditions at Marcus Island which was not passed on to prospective bidders; (2) that defendant did in fact make available to bidders all of the information that was available to it concerning such weather conditions; (3) that defendant had no reason to believe that the latter part of 1962 and the year 1963 would produce a greater number of typhoons than had normally occurred in prior years, wherefore plaintiff’s case for alleged misrepresentation is essentially based upon hindsight, and that the damaging storms were acts of God for which plaintiff assumed the risk; (4) that the testimony of plaintiff’s expert witness (a professional meteorologist from the University of Washington) is unworthy of credence because of his failure to distinguish between typhoons by Japanese standards and by standards of international agreement; and (5) that if plaintiff relied upon meteorological data specifically directed to average conditions, without making inquiry of its own, it assumed the risk.
(c) The evidence in the case will not support findings (1) that the representatives of either the Coast Guard or the Navy were guilty of conscious fraud in their representations concerning weather conditions at Marcus Island or (2) that defendant passed on to plaintiff all of the information available to it concerning such weather conditions.
*398 FINDINGS or Ultímate Fact
8. Plaintiff’s reliance upon defendant’s representations concerning weather conditions at Marcus Island was warranted,[10] and the interpretations drawn therefrom and the assumptions made by plaintiff in reliance thereon were reasonable.[11]
9. Defendant’s representation that “Marcus Island is considered to be well outside the normal typhoon zone” was misleading, as the representatives of both the Coast Guard and the Navy reasonably should have known, considering the art of meteorological science existing and generally known to exist in 1962.[12]
Conclusion oe Law
On the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover and judgment is entered to that effect. Determination of the amount of recovery will be made in further proceedings pursuant to Rule 47(c).

 The bid was submitted in the names ot Chris Berg, Inc., and Thos. Giuli, Ltd., as joint venturers, and the contract itself was executed in their names. Before the work was begun, however, Chris Berg, Inc., took over the interest of Thos. Giuli and thereafter Chris Berg, Inc., was the contractor.

 Plaintiff, Chris Berg, Inc., is a corporation under the laws of the State of Washington, with its principal offices at Seattle.

 The parties have stipulated that the quantum of damages is not to be determined until after decision of the issue of liability.

 No question has been raised in this proceeding as to failure by plaintiff to exhaust its administrative remedies, nor has any question been posed as to returning the case to the ASBCA.

 Cf. paragraph (f) of this finding.

 Neither the Coast Guard officer who prepared the weather data for the site surrey nor the Navy officer who prepared the contract documents was aware, until the trial of this action, of the Navy’s experience on the Island in 1945-1947.

 The meteorological unit of the loran station became operative in 1963. Moreover, Navy and Coast Guard personnel were aware of five authentic typhoons over Marcus Island in 1962 and 1963.

 As heretofore nortea, no one was on the Island from 1947 (after the Navy withdrew) until 1951, when the Japanese Meteorological Agency set up shop under contract with the Air Force.

 Inherent in this classification was the standard of 65 knots or greater wind velocity.

 All Information available was accessible to defendant and only to defendant.

 Defendant’s position in tbis case concerning average conditions and wind velocity of 66 knots or greater is overly tecbnical.

 The testimony of plaintiff’s expert witness warrants tbe conclusion that no trained meteorologist would have endorsed so sweeping a statement as late as 1962. The representatives of the Coast Guard and the Navy would have been well advised to seek professional advice before drafting either the site survey or the contract documents. Their failure to do so is dramatized by the fact that only the coincidence of Typhoon Emma in October 1962 may have saved the entire Installation from destruction by a typhoon at a later date.