SCOTT TIMBER COMPANY, Plaintiff,

v.

The UNITED STATES, Defendant.

Nos. 94–784C, 96–204C.

United States Court of Federal Claims.

June 3, 1999.

Alan I. Saltman, Saltman & Stevens, P.C., with whom were Ruth G. Tiger and Richard W. Goeken, Washington, D.C., for plaintiff.

John S. Groat, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and Kathryn A. Bleecker, Assistant Director, for defendant. Laurie Ristino and Susan Cook, Office of General Counsel, United States Department of Agriculture, of counsel.

## *OPINION*

MARGOLIS, Judge.

These consolidated cases are before the court on defendant's motion for reconsidera-tion of the court's March 12, 1998 opinion denying defendant's cross-motion for summary judgment in case 94–784C, *see Scott Timber Co. v. United States,* 40 Fed.Cl. 492 (1998), and on plaintiff's motions for leave to amend its complaints to add takings claims under the Fifth Amendment in cases 94–784C and 96–204C.

With regard to defendant's motion for reconsideration, defendant contends that the court erred in holding that a genuine issue of material fact existed as to whether the Forest Service's suspension of plaintiff's timber contracts was unreasonable because the Forest Service failed to design the timber sales with adequate protections for the marbled murrelet. According to defendant, Section 318 of the Department of Interior and Related Agencies Appropriations Act of 1990, Pub.L. No. 101–121, Tit. III, 103 Stat. 745 (1989) ("Section 318" or the "Northwest Timber Compromise") applied to the timber contracts and relieved the Forest Service of any statutory duty to design the sales with protections for the marbled murrelet. Defendant further contends that the circumstances surrounding the sales demonstrate that clause C6.25 was not intended to create a separate contractual duty to design the sales with protections for the marbled murrelet or to warrant that the sales were designed based on all the information then available.

After careful consideration of the record, and after hearing oral argument, the court, upon reconsideration, agrees with defendant that Section 318 applied to the timber sales at issue and relieved defendant of its statutory duty to protect the marbled murrelet when designing the timber sales. Moreover, the circumstances surrounding these sales do not evidence a separate contractual undertaking to design the sales with protections for the marbled murrelet or an implied warranty that the Forest Service had designed that sales with all information then available. Under Section 318 and the relevant provisions of the timber contracts, defendant acted reasonably in exercising its authority to suspend Scott Timber's contracts. Defendant's motion for reconsideration is therefore granted.

With regard to plaintiff's motions for leave to amend, defendant opposes plaintiff's proposed amendments on the grounds that defendant would be prejudiced by the amendments due to plaintiff's delay in bringing the motions and because the proposed takings claims are futile. After careful consideration of the parties' briefs, the court grants plaintiff's motions to amend because they are necessary to serve the interests of justice.

## BACKGROUND

Case 94–784C concerns 11 separate contracts that were made between plaintiff, Scott Timber Company ("Scott Timber"), and defendant, the United States, acting through the United States Department of Agriculture, United States Forest Service ("Forest Service"), for the sale and harvest of timber in the Siskiyou and Siuslaw National Forests in Oregon.[1] The sales at issue in this case were specifically authorized by Section 318 of the Department of the Interior Appropriations Act of 1990, which mandated that "[t]he Forest Service shall offer ... an aggregate timber sale level of seven billion seven hundred million board feet of net merchantable timber from the national forests of Oregon and Washington for fiscal years 1989 and 1990." § 318(a)(1).

After conducting environmental analyses of the Section 318 sales at issue in this case, the Forest Service issued "Findings of No Significant Impact" ("FONSIs") for each of the sale areas. Subsequently, the Forest Service solicited competitive bids for the sales between February 21, 1990 and September 10, 1990. Scott Timber was the high bidder on 11 sales, which were awarded to Scott Timber between April 1990 and October 1990.

Despite the Forest Service's award of the contracts and approval of Scott Timber's operating plans, the Forest Service suspended Scott Timber's performance under all of the contracts on or about September 17, 1992, before Scott Timber began harvesting timber

in earnest. The decision to suspend Scott Timber's operations was prompted by concerns over the protection of a small, robin-like bird known as the "marbled murrelet" (*Brachyramphus marmoratus*). More specifically, the Forest Service's decision was prompted by a Temporary Restraining Order ("TRO"), issued by Judge Barbara Rothstein of the United States District Court for the Western District of Washington, that prohibited the logging of any marbled murrelet habitat on the Siskiyou and Siuslaw National Forests. *Marbled Murrelet v. Lujan,* No. C91–522R (W.D.Wash. September 16, 1992).

Concerns about the protection of the marbled murrelet and its habitat had been raised several years prior to the district court's issuance of the TRO and the Forest Service's resulting decision to suspend plaintiff's contracts. In early 1988, the National Audubon Society and 32 of its chapters in Washington, Oregon, and California filed a petition with the United States Fish and Wildlife Service ("FWS") requesting that FWS list the murrelet as a "threatened species." On October 17, 1988, FWS accepted the Audubon Society's petition, and stated that "the petition presented substantial information indicating that [listing the murrelet as a threatened species] may be warranted." 53 Fed.Reg. 40,479 (Oct. 17, 1988). FWS invited public comments on the possible listing of the murrelet until December 1, 1988.

On January 6, 1989, FWS issued a revised notice identifying the marbled murrelet as a Category 2 taxa, that is, a taxa for which information then in the possession of FWS indicated that "proposing to list as endangered or threatened is possibly appropriate." 54 Fed.Reg. 554 (Jan. 6, 1989). The January 6 notice also "encourage[d] Federal agencies and other appropriate parties to take these taxa into account in environmental planning." *Id.* By March 1989, the Forest Service had identified the marbled murrelet as a "sensitive species" in Region 6, an area that includes the states of Oregon and Washington. Other federal and state agencies, including

---

1. The consolidated case of 96–204C concerns three additional timber contracts also between Scott Timber and the Forest Service. Case 96–204C was not at issue in plaintiff's motion for partial summary judgment or defendant's cross-

motion for summary judgment, and is therefore discussed in this opinion only as it relates to plaintiff's motion for leave to file an amended complaint in that case.

the United States Bureau of Land Management, the Washington Department of Wildlife, and the Oregon Department of Fish and Wildlife, had also listed the murrelet as a sensitive species. In addition, the California Department of Fish and Game had listed the murrelet as a "species of special concern."

Despite these actions, by April 1991 FWS had still not acted upon the Audubon Society's January 12, 1988 petition to list the marbled murrelet as a threatened species. Therefore, on April 17, 1991, several chapters of the Audubon Society filed suit against FWS in the United States District Court for the Western District of Washington, seeking to compel FWS to make a final decision whether or not to list the murrelet. *Marbled Murrelet v. Lujan*, No. C91–522 (W.D. Wash. filed April 17, 1991) ("murrelet listing suit"). Following the institution of the murrelet listing suit, FWS published a notice in the Federal Register proposing to list the marbled murrelet as a threatened species. 56 Fed. Reg. 28,362 (June 20, 1991). On July 29, 1992, FWS issued another notice in the Federal Register extending the deadline for making a final determination on the proposal to add the murrelet to the list of threatened species until December 20, 1992. 57 Fed. Reg. 33,478 (July 29, 1992).

By order dated September 15, 1992, Judge Rothstein of the Western District of Washington directed FWS to make a final determination concerning the marbled murrelet by September 18, 1992. *Marbled Murrelet v. Lujan*, No. C91–522 (W.D.Wash. Sept. 15, 1992). On September 16, 1992, the plaintiffs in the murrelet listing suit filed an amended complaint adding the Forest Service as a defendant. In their amended complaint, the Audubon Society, plaintiffs in the listing suit, sought to "enforce defendant U.S. Forest Service's duty to maintain a viable population of marbled murrelets on the national forests, as required by the National Forest Management Act, 16 U.S.C. § 1600 *et seq.*" The plaintiffs in the listing suit also sought and were granted a TRO on September 16, 1992. *Marbled Murrelet v. Lujan*, No. C91–522 (W.D.Wash. Sept. 16, 1992). Because this TRO prohibited "the logging of any marbled murrelet habitat" on a number of national

forests, including the Siskiyou and Siuslaw, *id.*, the Forest Service orally informed Scott Timber on September 17, 1992, that it was suspending operations under the contracts at issue in this case.

Although the September 16 TRO expired by its own terms on September 26, 1992, the Forest Service informed the district court that it would continue to suspend logging operations in the Siskiyou and Siuslaw until FWS made a determination on whether to list the marbled murrelet as a threatened species. Specifically, counsel for the Forest Service informed Judge Rothstein that an agreement had been reached between the Forest Service and the plaintiffs in the listing suit, whereby the Forest Service would not permit the felling of any trees in marbled murrelet habitat until close of business September 29, 1992, i.e., the date by which FWS was required to make a final listing decision. In addition, the Forest Service informed Judge Rothstein that, in the event that FWS decided to list the murrelet as a threatened species, the Forest Service agreed not to fell any trees until the Forest Service had made a determination as to whether or not the felling of trees would affect the marbled murrelet.

Acting pursuant to the district court's September 15, 1992 order, FWS published a notice in the Federal Register, effective September 28, 1992, listing the marbled murrelet as a threatened species. 57 Fed.Reg. 45,328 (Oct. 1, 1992). Consistent with its representations to the court that it would not fell any trees until a determination as to whether the felling of trees would affect the murrelet, the Forest Service informed Scott Timber by letter that the September 17 suspension would remain in effect until FWS issued a final biological determination concerning the marbled murrelet.

On October 1, 1992, the Forest Service initiated formal consultation with FWS, pursuant to section 7 of the Endangered Species Act, to determine what impact, if any, the proposed timber sales from the Siskiyou and Siuslaw National Forests would have on mar-

bled murrelet habitat.[2] After a long period of consultation and a series of draft biological opinions, the FWS issued a final biological opinion on May 11, 1994. According to the final biological opinion, seven of the sales at issue in this case had been surveyed and were determined to be occupied by marbled murrelets. The remaining four sales at issue in this case were determined to contain suitable marbled murrelet habitat, but had not yet been surveyed to determine whether these sale areas were in fact occupied by murrelets.

Throughout the end of 1994 and into 1995, the Forest Service sought technical assistance from FWS to determine if it was possible to reconfigure the Section 318 sales so that timber purchasers could begin harvesting timber in areas that were not occupied by marbled murrelet. In addition, on February 8, 1995, the Forest Service reinitiated formal consultations with FWS with respect to three particular Section 318 sale areas that are not at issue in this case. In response to this request, FWS took the initiative to prepare an amended biological opinion addressing all of the remaining Section 318 sales, including the 11 sales at issue in this case. A draft of this amended opinion was forwarded from FWS to the Forest Service on March 24, 1995, and on April 21, 1995, the Forest Service provided FWS with a response that summarized various applicant comments.

Finally, on June 12, 1995, FWS released a final amended biological opinion concerning the 77 remaining Section 318 sales. Under the heading "Reasonable and Prudent Alternatives," this amended opinion contained three recommendations. First, with respect to sale areas where at least one unit located in suitable marbled murrelet habitat was de-termined to actually be occupied by murrelets, the amended opinion recommended that the Forest Service "[c]ancel, suspend, or take action to otherwise withdraw from harvest, units determined to be occupied by marbled murrelets." (Def.'s Supp.App. at 0882.) Second, with respect to those areas that contained suitable murrelet habitat but for which murrelet occupancy had yet to be determined, FWS recommended that the Forest Service "[d]etermine murrelet occupancy of suitable habitat. The sale may proceed if all suitable murrelet habitat contained in the sale is determined to be unoccupied or when the sale is reconfigured to allow harvest of only unoccupied murrelet habitat." (*Id.*) Finally, with respect to sale areas where all of the units of suitable habitat were found to be occupied by murrelet, FWS was unable to identify any reasonable and prudent alternatives. (*Id.*)

Throughout the Forest Service's consultation with FWS, the 11 timber sale contracts at issue in this case remained suspended.[3] In June 1994 Scott Timber submitted formal claims to the Contracting Officer ("CO") under the Contract Disputes Act, alleging that the Forest Service's continued suspension of Scott Timber's contracts constituted a breach of contract. The CO denied each of Scott Timber's claims, and Scott Timber filed suit in this court in October 1994. Scott Timber advanced the same arguments to this court that it had made in its CDA claims. Namely, Scott Timber argued that the Forest Service lacked the contractual authority to suspend any of the contracts at issue for an extended and indefinite period of time, and that the Forest Service's continued suspension of the contracts therefore entitled Scott Timber to

---

**2.** Section 7 of the Endangered Species Act requires that every federal agency shall, "in consultation with and with the assistance of the Secretary [of Interior], ensure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species ...." 16 U.S.C. § 1536(a)(2). To achieve this goal, section 7 and its implementing regulations set forth a detailed consultation process. *See* 16 U.S.C. § 1536(b); 50 C.F.R. pt. 402.

**3.** As of March 12, 1998, the Forest Service had allowed Scott Timber to harvest timber from a number of units, which, according to plaintiff's counsel, amounted to approximately 35% of the volume of timber that was scheduled to be harvested from the sale areas at issue. The parties also negotiated and executed a number of contract modifications during the suspension period, which extended the contract termination dates and reduced or refunded plaintiff's downpayments.

breach of contract damages equal to the cost of obtaining replacement timber on the open market. Scott Timber and the Forest Service moved for summary judgment.

The court ruled on the parties' motions for summary judgment in its March 12, 1998 opinion. The court held that the timber contracts provided the Forest Service with authority to unilaterally suspend Scott Timber's performance and, therefore, denied plaintiff's motion. 40 Fed.Cl. at 503. The court went on to also deny defendant's cross-motion for summary judgment, however, because a genuine issue of material fact existed as to whether the Forest Service's suspension of plaintiff's contracts was unreasonable because the Forest Service failed to design the sales with adequate protection for the marbled murrelet. *Id.* at 507. In concluding that the Forest Service owed a duty to design the timber sales with protections for the marbled murrelet, the court reasoned that "clause C6.25 warranted that the Forest Service had taken adequate measures to protect sensitive species such as the marbled murrelet when designing the sales." *Id.* at 505–06. Further, in response to defendant's argument that Section 318 relieved the Forest Service of its statutory obligations to protect sensitive species when designing the timber sales at issue, the court reasoned that "Section 318 did not address the protection of sensitive species *other than the spotted owl.* . . . Therefore, Section 318 cannot be construed as a blanket waiver of the Forest Service's obligations to protect sensitive species such as the marbled murrelet." *Id.* at 507 (emphasis in original).

On March 26, 1998, defendant moved for reconsideration of the court's decision, arguing that the court erred in finding that Section 318 was inapplicable to the marbled murrelet and that contract clause C6.25 warranted that the Forest Service had taken adequate protective measures for the marbled murrelet when designing the sales.

On September 15, 1998, plaintiff moved for leave to file an amended complaint in case 96–204C and a second amended complaint in case 94–784C, seeking to add to each complaint an alternative theory of recovery un-der the Fifth Amendment takings clause. Defendant opposes the motions to amend.

## DISCUSSION

### I. Defendant's Motion for Reconsideration

#### A. Section 318

■ Congress enacted Section 318 in response to a timber shortage in the Pacific Northwest, caused by the competing interests of environmentalists and the timber industry in that area. *See Robertson v. Seattle Audubon Society,* 503 U.S. 429, 431–33, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992); 135 Cong. Rec. S12961 (daily ed. Oct. 7, 1989) (statement of Sen. Adams); 135 Cong. Rec. 22823–22824 (1989) (statement of Rep. Vento); 135 Cong. Rec. 22824 (1989) (statement of Rep. Swift). Congress sought to balance the interests of environmental groups, concerned with preserving the habitat of the northern spotted owl and other species, against the interests of the timber industry and communities whose economies were dependant on the timber industry, which had been plagued by delays in timber harvesting due to environment-related injunctions issued by district courts. *See Robertson,* 503 U.S. at 431–33, 112 S.Ct. 1407; 135 Cong. Rec. S12961 (daily ed. Oct. 7, 1989) (statement of Sen. Adams). Section 318 effectuated a compromise between these competing interests, which sought "[f]irst, to prevent the immediate loss of key stands of old growth timber important to the viability of the northern spotted owl and other species, and second, to release for harvest sufficient Federal timber to prevent the economic ruin of communities that depend on this timber." 135 Cong. Rec. 22823 (1989) (statement of Rep. Unsoeld); *see also Robertson* 503 U.S. at 433, 112 S.Ct. 1407.

In an effort to meet the concerns of both the environmentalists and the timber industry, Section 318 mandated timber sale quotas, on the one hand, and simultaneously placed new restrictions and prohibitions on certain timber sales, on the other. Subsection (a)(1) mandated the Forest Service to offer "an aggregate timber sale level of seven billion seven hundred million board feet of net merchantable timber from the national forests of Oregon and Washington for fiscal

years 1989 and 1990." § 318(a)(1). Subsection (a)(1) further required that of that 7.7 billion board feet of timber, "sales offered from the thirteen national forests in Oregon and Washington known to contain northern spotted owls shall meet an aggregate timber sale level for fiscal years 1989 and 1990 of five billion eight hundred million board feet of net merchantable timber...." *Id.* To ensure that the requisite level of timber sales went forward without undue delay, Section 318 also created streamlined administrative and judicial review procedures. *See* § 318(d), (g).

On the other hand, subsections (b)(1)[4] and (b)(2)[5] required the Forest Service to plan sales from the 13 national forests known to contain spotted owls so as to minimize the fragmentation of ecologically significant old growth forest stands. Moreover, subsections (b)(3)[6] and (b)(5)[7] identified Spotted Owl Habitat Areas ("SOHAs") and high priority spotted owl sites on the Oregon and Washington national forests from which no sales could be offered. The Act also established advisory boards comprised of both environmental and business concerns to provide recommendations to the Forest Service in reviewing possible timber sales. *See* § 318(c).

Finally, and of significant import to the present case, Section 318 also relaxed certain environmental requirements associated with the sale and harvest of timber from the national forests. Section 318(b)(6)(A) provided as follows:

> [T]he Congress hereby determines and directs that management of areas according to subsections (b)(3) and (b)(5) of this section on the thirteen national forests in Oregon and Washington and Bureau of Land Management lands in western Oregon known to contain northern spotted owls is adequate consideration for the purpose of meeting the statutory requirements that are the basis for the consolidated cases captioned Seattle Audubon Society et al. v. F. Dale Robertson, Civil No. 89–160 and Washington Contract Loggers Assoc. et al. v. F. Dale Robertson, Civil No. 89–99 ... and the case Portland Audubon Society et al., v. Manuel Lujan, Jr., Civil No. 87–1160–FR.

§ 318(b)(6)(A). The "statutory requirements" referenced in subsection (b)(6)(A) include, among others, the National Forest Management Act of 1976 ("NFMA"), 90 Stat. 2949, as amended, 16 U.S.C. §§ 472a, *et seq.* & 1600, *et seq.*, and the National Environment Policy Act of 1969 ("NEPA"), 83 Stat. 852, as amended, 42 U.S.C. § 4321, *et seq.*[8]

---

**4.** Subsection 318(b)(1) provides in relevant part that "[i]n accordance with subsection (b)(2) of this section, all timber sales from the thirteen national forests in Oregon and Washington known *to contain northern spotted owls* prepared or offered pursuant to this section shall minimize fragmentation of the most ecologically significant old growth forest stands."

**5.** Subsection 318(b)(2) provides in relevant part as follows:
> To the extent that fragmentation of ecologically significant old growth forest stands is necessary to meet the timber sale levels directed by subsection (a)(1) of this section, the Forest Service shall *minimize such fragmentation in* the ecologically significant old growth forest stands on a national forest-by-national forest basis based on the Forest Service's discretion in determining the ecologically significant stands after considering input from the advisory boards created pursuant to subsection (c) of this section.

**6.** Section 318(b)(3) provides in part:
> No timber sales offered pursuant to this section for the thirteen national forests in Oregon and Washington known to contain northern

spotted owls may occur within SOHAs identified pursuant to the Final Supplemental to the Environmental Impact Statement for an Amendment to the Pacific Northwest Regional Guide—*Spotted Owl and the accompanying Record of Decision ... as.adjusted by this subsection ... (D) For the Oregon Cast Range Province, which includes the Siuslaw National Forest, SOHA size is to be 2,500 acres; and (E) For the Klamath Mountain Province, which includes the Siskiyou National Forest, SOHA size is to be 1,250 acres.*

**7.** Section 318(b)(5) pertains only to sales offered on Bureau of Land Management lands, and is not relevant to the sales in the present case, which are on Forest Service lands.

**8.** The other statutory requirements that were the basis of the cases listed in Section 318(b)(6)(A) include the Migratory Bird Treaty Act, 40 Stat. 755, ch. 128, as amended, 16 U.S.C. § 703 *et seq.*; the Federal Land Policy and Management Act of 1976, 90 Stat. 2744, as amended, 43 U.S.C. § 1701 *et seq.*; and the Oregon–California Railroad Land Grant Act, 50 Stat. 874, 43 U.S.C. § 1181a. *See Robertson,* 503 U.S. at 432–33, 438, 112 S.Ct. 1407.

*See Robertson,* 503 U.S. at 438, 112 S.Ct. 1407. It is these two statutes that plaintiff contends obligated the Forest Service to protect the marbled murrelet when designing the timber sales at issue.

The first issue presently before this court is whether Section 318 amended NFMA and NEPA generally, as those statutes apply to all species, including the marbled murrelet, or solely as those statutes relate to the spotted owl. In its March 12, 1998 opinion, the court rejected defendant's argument that "[b]ecause the sales at issue [in this case] complied with subsection (b)(3) of Section 318, Congress deemed that these sales complied with NFMA, ... and, therefore, complied with any viability requirements for the marbled murrelet." 40 Fed.Cl. at 506 (quoting Def.'s Reply to Pl.'s Opp. to Def.'s Cross–Mot. for Summ. J. at 20–21). In reaching this conclusion, the court reasoned that Section 318 did not apply to species other than the spotted owl, such as the marbled murrelet. *Id.* at 507. Upon reconsideration, the court concludes that its interpretation of Section 318 was erroneous. Although the plain language and legislative history of Section 318 refer repeatedly to the spotted owl, nowhere does the statute limit its application to the spotted owl. On close examination, it is apparent that Section 318 was intended as a comprehensive short-term solution to the timber problems in the Pacific Northwest, and reference to the spotted owl in Section 318 is shorthand for identifying the Oregon and Washington national forests to which Section 318 applies—not the species to which it applies.

Whereas the impetus behind Section 318 was "to balance the goal of ensuring a predictable flow of public timber ... with the goal of preserving significant old growth forest stands as the habitat of the northern spotted owl," *Gifford Pinchot Alliance v. Butruille,* 742 F.Supp. 1077, 1079 (D.Or. 1990), Congress chose to effect that balance by targeting *certain forests,* not *certain species.* Section 318 placed a legal obligation on the Forest Service to "minimize fragmentation of ... ecologically significant old growth forest stands," and that obligation was created to protect not only the northern spotted owl, but also the many other species that

depend on old growth forest stands. *See* 135 Cong. Rec. 22823 (statement of Rep. Unsoeld) (Section 318 was designed "to prevent the immediate loss of key stands of old growth timber important to the viability of the northern spotted owl and other species."); 135 Cong. Rec. H6504 (daily ed. Oct. 3, 1989) (statement of Rep. DeFazio) ("This agreement is the first statutory protection for old growth forests."); 135 Cong. Rec. S12961 (daily ed. Oct. 7, 1989) (statement of Sen. Adams) (Section 318 "sets up a process which allows responsible harvesting of timber while protecting the very sensitive ecosystems and threatened species.... [T]he legislation takes a landmark step in officially recognizing the importance of old growth ecosystems and directing the Forest Service to protect those stands."); 135 Cong. Rec. S12962 (daily ed. Oct. 7, 1989) (statement of Sen. Gorton) (Section 318 "strives to prevent fragmentation of significant stands of old growth forest."). The statute refers to the northern spotted owl only as a geographical marker, to identify the particular forests to which Section 318 applies. *See Robertson,* 503 U.S. at 433, 112 S.Ct. 1407 (Section 318 "established a comprehensive set of rules to govern harvesting within a geographically and temporally limited domain."); *Northwest Forest Resource v. Glickman,* 82 F.3d 825, 829 (9th Cir.1996). Thus, where a timber sale is offered from one of the 13 national forests in Oregon and Washington known to contain northern spotted owls, the provisions of Section 318 will apply generally, to northern spotted owls and any other species that are in fact implicated.

The Supreme Court's opinion in *Robertson v. Seattle Audubon Society,* 503 U.S. 429, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992), supports a finding that Section 318 applies broadly to all species. There, the Court dealt with a constitutional attack on Section 318. In holding the statute constitutional, the Court suggested that Section 318(b)(6)(A) had a broad application to the underlying environmental statutes, without regard for species: "[Petitioners] argue that subsection (b)(6)(A) replaced the legal standards underlying the two original challenges with those set forth in subsections (b)(3) and (b)(5), without direct-

ing particular applications under either of the old or the new standards. We agree." *Id.* at 437, 112 S.Ct. 1407. In holding that subsection (b)(6)(A) "replaced the legal standards" underlying the original challenges, the Court in no way limited that replacement to legal standards affecting the spotted owl. *Id.*

Subsequent case law from the Ninth Circuit bolsters this understanding of Section 318 and demonstrates that subsection 318(b)(6)(A) provides an alternative means by which to comply with the relevant environmental requirements for purposes beyond the northern spotted owl. In *National Audubon Society v. United States Forest Service,* 46 F.3d 1437 (9th Cir.1993), the court considered a challenge to four Section 318 sales based on noncompliance with NEPA. The Audubon Society filed suit to enjoin the four sales, arguing that because the sales comprised roadless and undeveloped land, the Forest Service's failure to complete environmental impact statements ("EIS") before offering the sales breached NEPA. *Id.* at 1440–41. The parties stipulated that the four sales were authorized by Section 318, and the only question was how Section 318 affected the Forest Service's duties under NEPA when offering sales in roadless areas. *Id.* at 1443. The court held that Section 318(b)(6)(A) relieved the Forest Service from complying with NEPA, notwithstanding that the NEPA requirements at issue were unrelated to the northern spotted owl:

> *Robertson* requires the district court to examine the Forest Service's actions under the applicable laws, including NEPA, *as amended by § 318.* Under § 318, then, the Forest Service may satisfy the require-

ments of NEPA in one of two ways. In one approach, the Forest Service may follow the normal statutory procedures required by NEPA. This option requires the Forest Service to prepare an EIS for each timber sale if, on remand, the district court determines the Forest Service's decision not to prepare an EIS was arbitrary and capricious.

In the alternative, the district court may not have to address the NEPA issue at all. Instead, under *Robertson,* the district court may determine the Forest Service has satisfied these same NEPA requirements by "managing their lands so as to not violate the prohibitions of subsections (b)(3) and (b)(5)." *Robertson,* 503 U.S. at 437, 112 S.Ct. at 1413. In the language used by the Supreme Court, if the district court determines the timber sales do not violate §§ 318(b)(3) & (5), then "the harvesting [without first preparing an EIS] would ... be deemed to 'meet' [the requirements of NEPA] regardless of whether or not it would cause an otherwise prohibited [major federal action significantly affecting the quality of the human environment]." *Id.* If the Forest Service chooses to pursue this tack, the district court need not be concerned about the "roadless" or "roaded" nature of the timber sales.

*Id.* at 1446 (footnote omitted) (emphasis and brackets in original).

In the instant case, Scott Timber contends that the Forest Service failed to protect the sensitive marbled murrelet when designing the sales at issue, in violation of its statutory obligations under NFMA,[9] NEPA,[10] the Forest Service's "sensitive species" program,[11]

---

9. NFMA requires, among other things, that the Forest Service prepare Land and Resource Management Plans ("LRMPs") for each national forest in accordance with NEPA, and that the Forest Service ensure that contract specifications for the cutting and removal of national forest timber are *consistent with those plans. See* 16 U.S.C. §§ 1604(a), (g)(1) & (i); 36 C.F.R. § 223.30 (1990). NFMA further requires that fish and wildlife habitat be managed to maintain viable populations of plant and animal species that are well distributed in planning areas. 16 U.S.C. § 1604(g)(3)(B); 36 C.F.R. § 219.19.

10. NEPA requires that the Forest Service systematically examine the environmental consequences

of its proposed actions. 42 U.S.C. § 4321 *et seq.* Specifically, NEPA mandates that impacts of "[m]ajor Federal actions significantly affecting the quality of the human environment" be considered in an environmental impact statement unless a finding of no significant impact has been made. 42 U.S.C. § 4332(2)(C). The Forest Service customarily prepares an environmental assessment ("EA") to evaluate whether a significant impact exists. 40 C.F.R. § 1501.4(c) (1990).

11. The Forest Service's "sensitive species" program is an outgrowth of NFMA's mandate that

and the relevant Land Resource Management Plans ("LRMPs").[12] Specifically, Scott Timber argues that "the Forest Service failed to conduct detailed pre-bid surveys of the sale areas for marbled murrelets and/or marbled murrelet habitat and to establish contract specifications based on the results of those surveys." *See* Pl.'s Supp. Br. at 12.

The 11 timber sales at issue in the instant case, like the timber sales in *National Audubon Society*, were authorized by Section 318. Like the statutory requirements at issue in *National Audubon Society*, the statutory requirements that Scott Timber alleges the Forest Service failed to comply with can be satisfied through Section 318(b)(6)(A), notwithstanding that the alleged noncompliance is unrelated to the northern spotted owl. Because the Forest Service managed the 11 timber sales "according to subsections (b)(3) and (b)(5)" of Section 318, the Forest Service was relieved of its duty to otherwise comply with NEPA and NFMA. § 318(b)(6)(A).

Any obligations that the Forest Service had toward the marbled murrelet stemming from its sensitive species program were also relieved by Section 318(b)(6)(A), as the authority for the sensitive species program stems directly from NFMA. *See* 16 U.S.C. § 1604(g)(3)(B); 36 C.F.R. 219.19. Likewise, Scott Timber's argument that the applicable LRMPs required the Forest Service to conduct pre-award surveys for the marbled murrelet is not persuasive. Simply put, Section 318 deemed the Forest Service to be in compliance with statutory and regulatory obligations stemming from NFMA and NEPA for these sales. Congress enacted Section 318 as a comprehensive change to the environmental laws and regulations with the intent of having timber sales such as Scott Timber's go forward. To adopt plaintiff's interpretation of Section 318 would frustrate the Act's intended purpose by reading back into the statute environmental obligations

that Congress sought to avoid. The court therefore finds that the Forest Service met its statutory and regulatory obligations with regard to the marbled murrelet in designing the 11 timber sales at issue.

## B. Contractual Obligations Under Clause C6.25

██ Notwithstanding the court's present holding that Section 318 relieved the Forest Service from its statutory and regulatory obligations toward the marbled murrelet, the court must still address whether the Forest Service nonetheless created a contractual duty under clause C6.25 to design the sales with protections for the marbled murrelet. In its March 12, 1998 opinion, the court held that "clause C6.25 warranted that the Forest Service had taken adequate measures to protect sensitive species such as the marbled murrelet when designing the sales." 40 Fed. Cl. at 505–06. Defendant argues that this holding is erroneous because clause C6.25 must be read in conjunction with section 318, which authorized the timber sales at issue. According to defendant, when section 318 is properly understood as relieving the Forest Service of its duty to protect sensitive species, there were, as a matter of law, no areas needing special protective measures for the Forest Service to disclose. On reconsideration, the court concludes that its prior finding of a warranty under clause C6.25 was in error, and agrees with defendant that clause C6.25 must be read against the backdrop of the legislation that authorized the sales at issue to go forward.

Clause C6.25 provides, in part, as follows: Location of areas needing special measures for protection of plants or animals listed as threatened or endangered ... or as sensitive by the Regional Forester under the authority of [Forest Service Manual] 2670 are shown on Sale Area Map and identified on the ground. Measures needed to pro-

---

guidelines be developed to provide for diversity of plant and animal communities on the national forests. *See* 16 U.S.C. § 1604(g)(3)(B). The sensitive species program is designed to develop and implement management practices to ensure that viable populations of sensitive species are maintained. *See* Forest Service Manual ("FSM") 2670.22.

12. LRMPs direct the management of individual national forests. The LRMPs seek to provide sustained yield of the products and services obtained from the forests, and to coordinate the multiple uses of the forests, including outdoor recreation, range, timber, watershed, fish and wildlife, and wilderness. *See* 16 U.S.C. § 1604(e)(1).

tect such areas have been included elsewhere in this contract or are as follows: That the Forest Service identified no areas needing special protective measures and included no special protective measures to be taken on behalf of the marbled murrelet in Scott Timber's contracts is entirely consistent with its obligations under section 318.[13] The Forest Service had satisfied its statutory and regulatory obligations toward the marbled murrelet by managing the sales so as to not violate the prohibitions of subsections 318(b)(3) and (b)(5). Once the Forest Service satisfied this alternative means of complying with its duties toward the murrelet, it had no duty to undertake surveys or otherwise provide for the protection of the murrelet. Thus, the Forest Service identified no areas needing special protective measures and listed no special protective measures in the contracts because Congress directed, through section 318, that no special protective measures were required. Under these circumstances, the court is not prepared to find that the Forest Service's silence in the contract documents as to needed protective measures constituted a misrepresentation or warranted that the Forest Service had, in fact, taken measures to protect the marbled murrelet when designing the sales.[14]

The court is not persuaded by plaintiff's argument that although section 318 may have relieved the Forest Service from its duty to conduct environmental analyses of the sale areas, that once the Forest Service voluntarily undertook such investigations and came to possess relevant information concerning the murrelet, it had an obligation to fully report any needed protective measures under clause C6.25. According to plaintiff, the Forest Service's silence as to needed protective measures breached this obligation by failing to consider all reasonably available information and by failing to ensure that the representa-

tion in clause C6.25 was reasonably accurate. *See* Pl.'s Response to Def.'s Mot. for Recons. at 5 (citing *Hollerbach v. United States*, 233 U.S. 165, 172, 49 Ct.Cl. 686, 34 S.Ct. 553, 58 L.Ed. 898 (1914) (misstatement as to dam materials); *Everett Plywood & Door Corp. v. United States*, 190 Ct.Cl. 80, 92, 419 F.2d 425 (1969) (misstatement as to quantity of timber); and *Chris Berg, Inc. v. United States*, 186 Ct.Cl. 389, 397, 404 F.2d 364 (1968) (misstatement as to prospective weather conditions)).

Even assuming the Forest Service possessed relevant information concerning the murrelet's protection that it could have included in clause C6.25, the representations contained in clause C6.25 fail to create an implied warranty as to any measures actually taken. An implied warranty concerning the adequacy of the Forest Service's design of the sales must be "founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties, showing, in the light of the surrounding circumstances, their tacit understanding." *Hercules, Inc. v. United States*, 516 U.S. 417, 424, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996) (quoting *Baltimore & Ohio R.R. Co. v. United States*, 261 U.S. 592, 597, 58 Ct.Cl. 709, 43 S.Ct. 425, 67 L.Ed. 816 (1923)). Moreover, liability stemming from a misrepresentation in contract documents will be found only where the misrepresentation is one on which the contractor justifiably relies. *See Everett Plywood*, 190 Ct.Cl. at 92, 419 F.2d 425.

Here, the purpose and structure of Section 318, along with the terms of the contracts at issue, belie that the parties agreed upon any duty to design the sales with adequate protection for the marbled murrelet or that Scott Timber justifiably relied on any such representation. On the contrary, Section 318

---

**13.** The only exception to the Forest Service's silence as to protective measures was in the Indian Hook contract, where the Forest Service indicated that the habitat of the poa laxiflora (a sensitive plant species) required a protective buffer zone.

**14.** Indeed, it is difficult for human observers to identify marbled murrelet nests, and an accepted protocol for surveying the marbled murrelet did

not even exist during the period that the relevant contracts were designed. *See Northwest Forest Resource Council v. Pilchuck Audubon Soc.*, 97 F.3d 1161, 1167 (9th Cir.1996); *Marbled Murrelet v. Pacific Lumber Co.*, 880 F.Supp. 1343, 1350–51 & n. 15 (N.D.Cal.1995), *aff'd sub nom. Marbled Murrelet v. Babbitt*, 83 F.3d 1060 (9th Cir.1996), *cert. denied*, 519 U.S. 1108, 117 S.Ct. 942, 136 L.Ed.2d 831 (1997).

was designed to relieve the Forest Service of its duty to protect sensitive species such as the murrelet with the intent of having timber sales go forward without delay. In the face of a timber crisis, Congress expressly shifted the Forest Service's duty when designing sales from protecting sensitive species under NFMA and NEPA to minimizing fragmentation of old growth forest stands. *See* § 318(b)(1)-(2), (6)(A). Under these circumstances, the court is not persuaded that there was a meeting of the minds to provide special planning for the protection of the marbled murrelet.

Moreover, the absence of any justifiable reliance by Scott Timber concerning protective measures taken for the murrelet is supported by the provision of clause C6.25 permitting the Forest Service to unilaterally cancel or modify the contracts. This provision of clause C6.25 provides that:

> If protection measures prove inadequate, if other such areas [needing special protective measures] are discovered, or if new species are listed as Federally threatened or endangered or as sensitive by the Regional Forester, Forest Service may either cancel the contract under C8.2 or unilaterally modify this contract to provide additional protection *regardless of when such facts become known.* Discovery of such areas by either party shall be promptly reported to the other party.

Clause C6.25 (second sentence) (emphasis added). The language "regardless of when such facts become known" casts serious doubts on plaintiff's contention that the Forest Service warranted that its representations in the contract documents concerning protective measures were based upon all available information. Contrary to plaintiff's position, this provision of clause C6.25 alludes to continued information gathering by the Forest Service and possible suspension of the sales, if necessary. In light of this provision, Scott Timber could not have reasonably expected breach damages for the subsequent suspension of its contracts. Thus, the Forest Service's continued suspension of Scott Timber's contracts to comply with ESA requirements once the marbled murrelet was listed as a threatened species was not, as Scott Timber contends, unnecessary and unreasonable. Any expectation by Scott Timber that it would be entitled to breach damages for such a suspension were unfounded.

## II. Plaintiff's Motions for Leave to File Amended Complaints

On September 15, 1998, plaintiff moved under RCFC 15(a) to file an amended complaint in case 96-204C and a second amended complaint in case 94-784C to add the alternative allegation that defendant's suspension of the timber contracts constituted an unlawful taking of plaintiff's property under the Fifth Amendment. Defendant opposes the motions to amend on the grounds that plaintiff unduly delayed the filing of its motions to amend and the amended complaints would be futile.

■ The Supreme Court has liberally interpreted Rule 15(a), which governs the filing of untimely amendments to pleadings:

> Rule 15(a) declares that leave to amend "shall be freely given when justice so requires"; this mandate is to be heeded. If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (citations omitted). In applying this permissive standard for amending pleadings, courts have placed the greatest emphasis on the consideration of prejudice to the opposing party. *See United States v. Hougham,* 364 U.S. 310, 316, 81 S.Ct. 13, 5 L.Ed.2d 8 (1960); *Siemens Aktiengesellschaft v. United States,* 26 Cl.Ct. 312, 313 (1992); *Croskey v. United States,* 24 Cl.Ct. 420, 422 (1991); *Effingham County Bd. of Ed. v. United States,* 9 Cl.Ct. 177, 180 (1985). The decision to allow an untimely amendment to the pleadings is within the

discretion of the trial court. *See Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 330, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); *Te–Moak Bands of Western Shoshone Indians v. United States,* 948 F.2d 1258, 1260 (Fed.Cir.1991); *Mitsui Foods, Inc. v. United States,* 867 F.2d 1401, 1403 (Fed.Cir.1989).

■ In demonstrating that it will be prejudiced by a proposed amendment, the non-movant has the burden of showing that "it will be severely disadvantaged or incapable of presenting facts or evidence" on the new issue. *Croskey,* 24 Cl.Ct. at 422 (quoting *Cornell & Co. v. Occupational Safety and Health Review Commission,* 573 F.2d 820, 823 (3d Cir.1978)). Although defendant contends that it "clearly would be unfairly prejudiced by the allowance of the proposed amendments," Def.'s Opp. to Pl.'s Mot. to File Amended Compl. at 8–9, defendant has failed to identify any disadvantage or other specific harm that it will suffer as a result of plaintiff's amendments. Defendant will face no significant burden in responding to plaintiff's amended complaint, as it adds only an additional theory of recovery and is based on the same operative facts as plaintiff's breach of contract claims. *See Tefft v. Seward,* 689 F.2d 637, 639 (6th Cir.1982) (Where "the facts as set forth in [plaintiff's] original complaint would support [the amended] cause of action," the amended complaint is "not so different as to cause prejudice to the defendants."); *Buder v. Merrill Lynch, Pierce, Fenner & Smith,* 644 F.2d 690, 694 (8th Cir.1981) ("Where the facts on which a previously unasserted claim is based are all known or available to all parties, there is no prejudice in allowing an amended complaint."); *Heay v. Phillips,* 201 F.2d 220, 222 (9th Cir.1952) ("It is said upon good authority that '[a]n amendment should be allowed where the factual situation is not changed even though a different theory of recovery is presented.' "). That defendant will be inconvenienced by the need to brief plaintiff's additional claims is not the equivalent of prejudice. *See Effingham,* 9 Cl.Ct. at 180–81. Nor do plaintiff's amendments come on the eve of trial, like many of the motions to amend that the courts have found it necessary to deny. *See, e.g., First Interstate*

*Bank of Billings v. United States,* 61 F.3d 876, 881–82 (Fed.Cir.1995) (denying motion to amend filed three weeks prior to trial); *Spalding & Son, Inc. v. United States,* 22 Cl.Ct. 678, 681 (1991) (same).

■ Defendant's arguments that the court should deny plaintiff's motions to amend because plaintiff's takings claims would be futile also must be rejected. A motion to amend is futile where the proposed claim is "frivolous and insufficient on its face," *Croskey,* 24 Cl.Ct. at 423, or where the proposed claim would not withstand a motion to dismiss. *See Slovacek v. United States,* 40 Fed. Cl. 828, 834 (1998). Defendant, relying heavily on *Janicki Logging Co. v. United States,* 36 Fed.Cl. 338 (1996) and similar cases, contends that plaintiff's proposed takings claims are futile because government interference with rights voluntarily created by contract gives rise to a breach of contract claim, not a Fifth Amendment takings claim. Unlike the situation in *Janicki Logging* where the court dismissed for failure to state a claim, however, it is not clear in the present case that defendant "at all times ... purported to act pursuant to and consistent with the terms of the contract and never suggested that it was not bound by each term in the contract." *Janicki Logging,* 36 Fed.Cl. at 346. Rather, defendant in the instant case argued just the opposite; namely, the Forest Service suspended plaintiff's timber contracts by virtue of a sovereign act, for the public good.

■ Thus, although the court agrees with defendant that plaintiff faces significant obstacles in succeeding on the merits with its Fifth Amendment takings claims, the court cannot say that plaintiff's claims are frivolous or that they would fail to withstand a motion to dismiss. Where a proposed amendment would need to be evaluated on its merits, the motion to amend should be granted and the claim properly heard. *See Effingham,* 9 Cl. Ct. at 181 (explaining that the *Foman* test does not require the court to "reach the legal merits of the cause of action being added"); *Key Pharmaceuticals, Inc. v. Lowey,* 54 F.R.D. 447, 449 n. 5 (S.D.N.Y.1972) ("[A]bsent a claim or defense that is frivolous or

patently insufficient, its substantive merits or lack therefor are not considered on a motion for leave to amend."). In keeping with the liberal interpretation of Rule 15(a), and because defendant has failed to demonstrate that any of the *Foman* factors are present in this case, plaintiff's motions for leave to amend its complaints are hereby granted.

## CONCLUSION

Because the Forest Service satisfied its statutory, regulatory, and contractual obligations toward the marbled murrelet when designing the sales at issue, no genuine issue of material fact exists as to whether the Forest Service acted unreasonably in suspending Scott Timber's contracts. Defendant's motion for reconsideration is granted. The Clerk is directed to vacate the court's March 12, 1998 opinion. Plaintiff's motions for leave to amend its complaints in cases 94–784C and 96–204C are also granted.